1  BASANT GAJJAR (In Propria Persona)

2  basant555@protonmail.com

3  Address: Not applicable. No permanent address available.

4  Telephone: Not Applicable

5

6                    **UNITED STATES DISTRICT COURT**

7                    **NORTHERN DISTRICT OF CALIFORNIA**

8                    **OAKLAND DIVISION**

9

10

11

12  **FACEBOOK, INC., a Delaware corporation; INSTAGRAM, LLC, a Delaware limited liability company,**

Case No:  4:20-CV-02429-KAW

13                                                        **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR TERMINATING SANCTIONS PURSUANT TO FED. R. CIV P. 11, COURT'S INHERENT AUTHORITY AND (28 U.S. CODE § 1927); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

14                    **Plaintiffs,**

15          **vs.**

16  **BASANT GAJJAR, d/b/a "LeadCloak",**

17                    **Defendant.**

18                                                        Date:          September 1, 2022
                                                          Time:          1:30 p.m.
19                                                        Courtroom:  TBD

20                                                        Date Action Filed: April 9, 2020

21                                                        [Separate Declaration filed concurrently]

22

23

24

25

26

27

28

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on September 1st, 2022 at 01:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom TBD of the above-entitled Court, located in the Ronald Dellums Federal Building, 1301 Clay Street, 2nd Floor, Oakland, California, Defendant Basant Gajjar (hereinafter, collectively "Defendant") will and hereby do move this Court for an Order terminating this action with prejudice, for monetary sanctions in an amount the Court determines to be just, and imposing such other sanctions as this Court deems appropriate.

Defendant brings this Motion for Terminating Sanctions pursuant to Rules 11 of the Federal Rules of Civil Procedure, inherent authority of the Court, and 28 U.S.C. §1927. The Motion is based on the following grounds:

1.   Plaintiffs brought this action in bad faith, in violation of the law, Fed. R. Civ. P. Rule 11, and specifically Title 47 Section 230, among other things, in false claims for its personal gain.

2.   Monetary sanctions are appropriate in addition to terminating sanctions due to Plaintiff's willful, and bad faith conduct.

**3.**   Plaintiffs have provided this Court with documents executed by them and evidences that are factually incorrect and thus committed perjury.

This motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in Support, Declaration of Basant Gajjar in Support of this Motion, and all the pleadings and papers on file herein, including Defendant's Motion For Terminating Sanctions, which are concurrently filed with this Motion, and on such other evidence and argument as may be presented at the hearing on this matter.

Respectfully Submitted,

Date: July 15, 2022                                     BASANT GAJJAR

By:  /s/ Basant Gajjar

Defendant in Pro Per

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

I.   INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ........................................................................................... 2

III. LEGAL STANDARDS ................................................................................................ 3

A.   Authority to Issue Terminating or Dismissal Sanctions ................................. 4

B.   Courts Apply A Five Factor Test Relating To Dismissal Sanctions ........................ 5

IV. ARGUMENTS............................................................................................................... 6

A.   Plaintiffs' Misconduct Compels Terminating Sanctions Because Plaintiffs Have
     Made It Impossible To Know The Truth In This Case ................................. 6

B.   Plaintiffs Have Submitted False And/Or Misleading Affidavits ................................. 7

C.   Evidence Fabrication of the alleged SlingFile Limited "Contract" (Account)............ 9

D.   Plaintiffs Have Suppressed and Fabricated "Jurisdictional" Evidence..................... 11

E.   Plaintiffs Have Come To The Court With Willfulness, Bad Faith, And Fault .......... 13

F.   The Court Should Terminate This Action Pursuant To Its Inherent Sanctioning
     Power And/or Rule 11 ................................................................................ 17

G.   The Five factor Test Heavily Weighs in Favor of Dismissal.................................... 19

     1.   First Factor: The Public's Interest in Expeditious Resolution ......................... 19

     2.   Second Factor: The Court needs to manage its Docket ................................. 20

     3.   Fourth Factor: Public Policy in Favor of Disposing of Cases on the Merits .... 21

     4.   Third Factor: Risk of Prejudice.......................................................... 22

     5.   Fifth Factor: Availability of Lesser Sanctions ................................................. 24

H.   Monetary Sanctions Should Also Be Awarded To Defendant For Fees And Expenses
     Incurred Relating To Plaintiffs' Recalcitrant Conduct ............................................. 25

V.  Conclusion ................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Pages(s)**

3

<u>Cases</u>

4

*Adriana Int'l Corp. v. Thoeren,*

5

    913 F.2d 1406, 1412 (9th Cir. 1990) ......................................................... 22

6

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.,*

7

    2015 WL 12732433, at *26 (C.D. Cal. Dec. 14, 2015) ........................................ 25

8

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors,*

9

    69 F.3d 337, 348 (9th Cir. 1995) .................................................... 2, 5, 7, 12

10

*Aoude v. Mobil Oil Corp.,*

11

    892 F.2d 1115, 1117 (1st Cir. 1989) ...................................................... 10, 13

12

*Arista Records LLC v. Usenet.com, Inc.,*

13

    633 F. Supp. 2d at 138 (S.D.N.Y. 2009) ........................................................ 4

14

*Armstrong v. Spearman,*

15

    2015 WL 5021664, at *2 (E.D. Cal. Aug. 21, 2015) ........................................... 20

16

*Arnold v. County of El Dorado,*

17

    2012 WL 3276979 at *4 (E.D. Cal. Aug. 9, 2012) ............................................... 7

18

*Brady v. United States,*

19

    877 F. Supp. 444 (C.D. Ill. 1994) .......................................................... 10

20

*Carl Zeiss Vision Int'l GmbH v. Signet Armorlite,* Inc.,

21

    2009 WL 10668689, at *3 (S.D. Cal. Mar. 17, 2009) ........................................... 7

22

*Chambers v. NASCO, Inc.,*

23

    501 U.S. 32 ............................................................................. 3, 6, 17

24

*Chaudhry v. Ksenzowski (In the Matter of Ksenzowski),*

25

    56 B.R. 819, 835 (Bankr. E.D.N.Y. 1985) ...................................................... 8

26

*Combs v. Rockwell International Corp.,*

27

    927 F.2d 486, 488 (9th Cir. 1991) ............................................................ 5

28

*Commodity Futures Trading Com'n v. Noble Metals Intern., Inc.*,

    67 F.3d 766,770 (9th Cir. 1995) ............................................................................ 1

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,

    482 F.3d 1091, 1096 (9th Cir. 2007) ............................................. 1, 4, 7, 13, 24

*Copelco Capital, Inc. v. General Consul of Bolivia*,

    940 F. Supp. 93, 95-96 (S.D.N.Y. 1996) ................................................................ 8

*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*,

    2019 WL 6527951, at *5, 17 (S.D. Cal. Dec. 4, 2019) .......................................... 6

*DLC Mgmt. Corp. v. Town of Hyde Park*,

    163 F.3d 124, 135 (2d Cir. 1998) ........................................................................... 3

*Dreith v. Nu Image, Inc.*,

    648 F.3d 779, 788 (9th Cir. 2011) ........................................................................ 22

*Eitel v. McCool*,

    782 F.2d 1470, 1472 (9th Cir. 1986) .................................................................... 21

*Estrada v. Speno & Cohen*,

    244 F.3d 1050, 1057 (9th Cir. 2001) .................................................................... 25

*Fink v. Gomez*,

    239 F.3d 989, 991 (9th Cir. 2001) ......................................................................... 4

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*,

    115 F. Supp. 2d 898, 904 (S.D. Ohio 2000) ......................................................... 8

*Fjelstad v. Am. Honda Motor Co., Inc.*,

    762 F.2d 1334, 1338 (9th Cir. 1985) ..................................................................... 6

*Garcia v. Berkshire Life Ins. Co. of Am.*,

    569 F.3d 1174, 1180 (10th Cir. 2009) ....................................................... 11, 23, 24

*Gonzales v. Mills*,

    2011 WL 976713, at *5 (E.D. Cal. Mar. 16, 2011) .............................................. 20

*Haeger v. Goodyear Tire & Rubber Co.*,

    793 F.3d 1122, 1131-32 (9th Cir. 2015) ................................................................ 6

*Halaco Engineering Co. v. Castle*,

   843 F.2d 376, 380 (9th Cir. 1988) ........................................................................... 5, 23

*Henry v. Gill Indus., Inc.*,

   983 F.2d 943, 949 (9th Cir. 1993) ............................................................................... 14

*Hernandez v. City of El Monte*,

   138 F.3d 393, 399 (9th Cir. 1998) ............................................................................... 22

*Hutchinson v. Hensley Flying Serv., Inc.*,

   210 F.3d 383, (9th Cir.2000) ....................................................................................... 11

*In re Eisen*,

   31 F.3d 1447, 1452–53 (9th Cir. 1994) ...................................................................... 22

*In re Exxon Valdez*,

   102 F.3d 429, 432 (9th Cir. 1996) ............................................................................... 12

*In re Lindley*,

   29 Cal. 2d 709, 723 (1947) .......................................................................................... 17

*In re Phenylpropanolamine (PPA) Prods. Liab*. Litig.,

   460 F.3d 1217, 1227 (9th Cir. 2006) ............................................... 19, 20, 21, 22, 24

*In re Sucato*,

   152 F.3d 929, at *1 (9th Cir. 1998) ............................................................................. 21

*In re Tuto Wells Contamination Litigation*,

   120 F. 3d 368 (3d Cir. 1997) ....................................................................................... 17

*Jackson v. Murphy*,

   468 Fed.Appx. 616, 620 (7th Cir.2012) ..................................................................... 13

*Jones v. NFTA*,

   836 F.2d 731, 734 (2d Cir. 1987) .................................................................................. 4

*Jorgensen v. Cassiday*,

   320 F.3d 906, 912 (9th Cir. 2003) ......................................................................... 13, 14

*Kenno v. Colorado's Governor's Off. of Info. Tech.*,

   2021 WL 2682619, at *19 (D. Colo. June 30, 2021) ................................................. 10

*Lee v. Trees, Inc.,*

    2017 WL 5147146, at \*6 (D. Or. Nov. 6, 2017)................................................................. 12

*Leon v. IDX Sys. Corp.,*

    464 F.3d 951 (9th Cir. 2006)........................................................ 6, 7, 11, 12, 19, 21, 23, 25

*Malone v. U.S. Postal Serv.,*

    833 F.2d 128, 131–32 (9th Cir. 1987) ......................................................................... 24

*Margo v. Weiss,*

    213 F.3d 55, 59 (2d Cir. 2000) ..................................................................................... 8

*McDonald v. Head Crim. Court Supervisor Officer,*

    850 F.2d 121, 124 (2d Cir. 1988) ............................................................................... 11

*Nat'l Corp. Tax Credit Funds III, IV, VI, VII v. Potashnik,*

    2010 WL 457626, at \*4 (C.D. Cal. Feb. 4, 2010)...................................................... 14

*Nat'l Hockey League v. Metro. Hockey Club, Inc.,*

    427 U.S. 639, 643 (1976).......................................................................................... 4, 20

*Newman v. Brandon,*

    2012 WL 4933478, at \*4 (E.D. Cal. Oct. 16, 2012)............................................... 7, 11

*Pagtalunan v Galaza,*

    291 F. 3d, 639, 642 (9th Cir. 2002) ................................................................. 19, 20, 21

*Pena v. Seguros La Comercial, S.A.,*

    770 F.2d 811, 814 (9th Cir. 1985) ............................................................................... 21

*Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.,*

    682 F.2d 802, 806 (9th Cir. 1982) ............................................................................. 12

*Pope v. Fed. Exp. Corp.,*

    974 F.2d 982, 984 (8th Cir. 1992)........................................................................ 10, 13

*Pumphrey v. K.W. Thompson Tool Co.,*

    62 F.3d 1128, 1132 (9th Cir.1995)............................................................................. 11

*Sanchez v. Rodriguez,*

    298 F.R.D. 460, 463 (C.D. Cal. 2014)....................................................................... 13

DEFENDANT BASANT GAJJAR'S MOTION FOR TERMINATING SANCTIONS

*SEC v. Seaboard Corp.,*

  666 F.2d 414, 417 (9th Cir. 1982) ........................................................................................ 22

*Shepherd v. American Broad. Cos.,*

  62 F.3d 1469, 1472 (D.C. Cir. 1995) ..................................................................................... 8

*State Farm Mut. Auto. Ins. Co. v. Grafman,*

  274 F.R.D. 442, (E.D.N.Y. 2011) ........................................................................................... 4

*Sun World, Inc. v. Lizarazu Olivarria,*

  144 F.R.D. 384, 390 (E.D. Cal. 1992) ............................................................................... 5, 13

*TeleVideo Systems, Inc. v. Heidenthal,*

  826 F.2d 915, 916 (9th Cir. 1987) ................................................................................. 4, 6, 13

*Thompson v. Hous. Auth. of Los Angeles,*

  479 U.S. 829 (1986) ................................................................................................................. 6

*U.S. v. Kahaluu Const.,*

  857 F.2d 600, 603 (9th Cir. 1988) .......................................................................................... 1

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,*

  982 F.2d 363, 368 (9th Cir.1992) ........................................................................................... 6

*United States v. Nat'l Medical Enters., Inc.,*

  792 F.2d 906, 912–913 (9th Cir.1986) ............................................................................ 23, 24

*Uribe v. McKesson,*

  No. 08-CV01285-SMS PC, 2011 WL 3925077, at *5 (E.D. Cal. Sep. 7, 2011) .................... 21

*Valley Engineers Inc. v. Elec. Eng'g Co.,*

  158 F.3d 1051, 1057 (9th Cir. 1998) ............................................................... 1, 7, 19, 21, 24

*Virginia Supreme Court in Gentry v. Toyota Motor Corporation,*

  252 Va. 30, 34, 4 71 S.E.2d 485, _ (1996) ............................................................................ 4

*Wanderer v. Johnston,*

  910 F.2d 652, 656 (9th Cir. 1990) ........................................................................................ 19

*West v. Goodyear Tire & Rubber Co.,*

  167 F.3d 776, 779 (2d Cir. 1999) ........................................................................................... 4

DEFENDANT BASANT GAJJAR'S MOTION FOR TERMINATING SANCTIONS

*Winters v. Jordan,*

2013 WL 5780819, at *10 (E.D. Cal. Oct. 25, 2013) ............................................. 22

*Wyle v. R.J. Reynolds Indus., Inc.,*

709 F.2d 585, 589 (9th Cir. 1983) ................................................... 11, 12

*Yourish v. Cal. Amplifier,*

191 F.3d 983, 990 (9th Cir. 1999) ..................................................... 20

**<u>Statutes</u>**

28 U.S.C. § 1927 ........................................................................ 4, 8

Cal. Penal Code § 123 .................................................................. 17

California Penal Code section 118(b) ................................................... 17

Federal Rule of Civil Procedure 11 ............................................ 4, 5, 7, 8, 11, 17

Federal Rule of Civil Procedure 37 ....................................................... 6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Defendant presents this motion for terminating sanctions and other relief to put an end to Plaintiffs and its counsel's intentional and unrelenting pattern of misconduct to corrupt this proceeding with illegal and unethical behavior. As this memorandum will show, these tactics have so damaged the integrity of the proceedings in this case that there can be no "assurance of proceeding on the true facts." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096–97 (9th Cir. 2007) (citation and internal quotation marks omitted). Such actions also violate federal law and ethical rules and warrant sanctions not only against Plaintiff, but also against those of its counsel (in-house and Hunton AK) complicit in this misconduct.

Defendant seeks terminating sanctions based on attorney misconduct, plaintiffs' false statements under penalty of perjury proven by a material facts, and production of fabricated evidences. Preclusion or terminating sanctions are authorized only in "extreme circumstances" of violations "due to willfulness, bad faith, or fault of that party." *U.S. v. Kahaluu Const.*, 857 F.2d 600, 603 (9th Cir. 1988); see also *Commodity Futures Trading Com'n v. Noble Metals Intern., Inc.*, 67 F.3d 766,770 (9th Cir. 1995) (affirming standard and upholding sanctions in egregious circumstances). The exhaustive facts do support a recommendation of dismissal of the case at this time. Plaintiffs have continued their recalcitrant behavior, before and after the action was filed, for over two years, and such sanctions are warranted.

As the Ninth Circuit has explained, "[t]here is no point to a lawsuit, if it merely applies laws to lies." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998). Defendant requests that the Court exercise its inherent authority to dismiss this case against Plaintiffs, based on their knowing submission of false and forged declarations, which has imposed on this Court just such an untenable task of applying the laws to plaintiffs' lies.

Additionally, the Ninth Circuit has found that, where a court "conclud[es] from [a litigant's] repeated behavior that she [or he] will 'say anything at any time in order to prevail in this litigation[,]'" it is appropriate for the lower court to have found that it "had no choice but to

DEFENDANT BASANT GAJJAR'S MOTION FOR TERMINATING SANCTIONS

1    dismiss" the plaintiff's litigation. *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337,

2    348 (9th Cir. 1995).

3        Defendant respectfully submits that enough is enough. Plaintiffs have abused the privilege of

4    proceeding with their case in Federal Court. Given their conduct, the Court simply cannot assure

5    that the truth will be available at trial. Dismissal is warranted. Additionally, Plaintiffs should be

6    required to reimburse Defendant for their malfeasance.

7                              **II.  STATEMENT OF FACTS**

8        Defendant is not a stranger to this court. Plaintiffs have continued their recalcitrant behavior

9    for over two years and such sanctions are warranted. This lawsuit is frivolous on its face. The

10   plaintiffs and their global multi-national counsel working in different time zones in a concerted

11   effort have abused this Court's resources by submitting false affidavits and statements, and

12   fabricating evidences either by fraud or mistake and therefore, rely on perjured information.

13       Throughout this litigation, Plaintiffs and its' counsel have engaged in a shocking pattern of

14   using money, influence, dishonesty, harassment, and threats to achieve their litigation goals.

15       Plaintiffs have willfully misled the Court concerning critical issues at different stages of this

16   litigation through the submission of knowingly false and forged declarations.  Under Ninth Circuit

17   precedent, such conduct warrants dismissal against Plaintiffs under the Court's inherent authority.

18       As a threshold matter, the misconduct at issue was willful and bad faith, because plaintiffs

19   knew the declarations were false or forged and yet they took no steps to correct them; on the

20   contrary, plaintiffs attempted to conceal the wrongdoing with further false pleadings.  "It is well

21   settled that dismissal is warranted where . . . a party has engaged deliberately in deceptive

22   practices that undermine the integrity of judicial proceedings." *Anheuser-Busch*, 69 F.3d at 348.

23       Examples of such acts may be noted first that, Plaintiffs knew that SlingFile Limited did not

24   have a contract with Facebook, yet they held out the assertion that SlingFile Limited has a contract

25   which Defendants believe misled the Court in said contract. Secondly, Plaintiffs were aware that

26   LeadCloak was launched in May 2018, was in *beta* until Dec 2018, and did not offer services to

27   the United States, however, it continued the narrative despite factual proof otherwise. Finally,

28   Plaintiffs have had strong evidence a year prior to filing the suit that LeadCloak was not designed

1   to circumvent Facebook ads services and have not provide any such facts to the contrary, however,

2   it continued such narrative and filed a frivolous action against LeadCloak. *See* Gajjar *Decl.*

3   ### III. <u>LEGAL STANDARDS</u>

4       Federal courts have a "well-acknowledged inherent power to levy sanctions in response to

5   abusive litigation practices." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 135 (2d Cir.

6   1998). This inherent power derives from the "sage acknowledgment that courts are 'vested, by

7   their very creation, with power to impose silence, respect, and decorum, in their presence, and

8   submission to their lawful mandates.'" *Id*. at 136 (quoting *Chambers v. NASCO, Inc.,* 501 U.S.

9   32, 43 (1991)).[1] Courts in the Second Circuit exercise their inherent power to assess sanctions

10  "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*.

11  (internal quotation marks omitted).

12      The Court's inherent authority casts a wide net by "reach[ing] both conduct before the court

13  and that beyond the court's confines[ .]" *Chambers*, 501 U.S. at 44. In this sense, this motion

14  must be considered in the larger context of Plaintiffs' repeated abusive litigation tactics both in

15  the United States and in Thailand. When deciding on the proper sanction to issue, a court generally

16  must consider the offending party's willfulness or bad faith, the offending party's history of

17  misconduct including noncompliance with court orders and requests from the opposing party, the

18  effectiveness of lesser sanctions, whether the offending party has been informed about the

19  possibility of sanctions, and possible prejudice to the moving party. (citing *DLC Mgmt. Corp.,*

20  163 F.3d at 136).

21      The sanctions should also deter parties from engaging in misconduct and remedy the damage

22  to the nonoffending party. When the offending party has engaged in truly willful or bad faith

23  egregious litigation practices, the Supreme Court has affirmed that "outright dismissal of a lawsuit

24  . . . is within the court's discretion." *Chambers*, 501 U.S. at 45. In the Second Circuit, terminating

25  sanctions may be granted if there is "a showing of willfulness, bad faith, or fault on the part of

26

27  [1] Notably, the existence of a rule or statute describing a mechanism by which a court may impose sanctions for a specific type of abuse does not limit the courts' inherent power to fashion sanctions. *Chambers v. NASCO*, Inc., 501 U.S. 32, 45-46 (1991).

28

1    the sanctioned party." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999);

2    See also *Jones v. NFTA,* 836 F.2d 731, 734 (2d Cir. 1987). Finally, VA Supreme Court summed

3    up the sanctions. As stated by the *Virginia Supreme Court in Gentry v. Toyota Motor Corporation*,

4    252 Va. 30, 34, 4 71 S.E.2d 485, _ (1996): "The purpose of such a sanction is to punish the

5    offending party and deter others from acting similarly."

6         Terminating sanctions are appropriate "[w]here a party so damages the integrity of the

7    discovery process that there can never be assurance of proceeding on the true facts." *Conn. Gen.*

8    *Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096– 97 (9th Cir.2007) (citation

9    and internal quotation marks omitted). Although terminating sanctions are reserved for extreme

10   circumstances, "in this day of burgeoning, costly and protected litigation courts should not shrink

11   from imposing harsh sanctions where they are clearly warranted." *Arista Records LLC v.*

12   *Usenet.com, Inc.*, 633 F. Supp. 2d at 138 (S.D.N.Y. 2009) (quoting *Jones v. NFTA,* 836 F.2d 731,

13   735 (2d Cir. 1987)). Terminating sanctions are particularly suitable when lesser sanctions would

14   not be an effective deterrent or remedy for the party's severe misconduct. *State Farm Mut. Auto.*

15   *Ins. Co. v. Grafman*, 274 F.R.D. 442, (E.D.N.Y. 2011). Terminating sanctions are intended not

16   just as a penalty, but rather to deter those who might be tempted to such conduct in the absence

17   of such a deterrent. *Nat'l Hockey League v. Metro. Hockey Club, Inc*., 427 U.S. 639, 643 (1976).

18   Plaintiffs and their counsel's conduct warrant terminating sanctions here.

19        A.    <u>**Authority to Issue Terminating or Dismissal Sanctions**</u>

20        Federal courts have broad powers to impose sanctions against parties and/or counsel for

21   improper conduct in litigation. The three main sources of authority to impose sanctions are: (1)

22   Federal Rule of Civil Procedure 11, which applies to signed writings filed with the court; (2) 28

23   U.S.C. § 1927, which is aimed at penalizing conduct that unreasonably and vexatiously multiplies

24   the proceedings; and (3) the court's inherent power. *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir.

25   2001). The Court's inherent power allows the Court to dismiss actions or enter default judgments

26   for failure to prosecute, contempt of court, or abusive litigation practices. *TeleVideo Systems, Inc.*

27   *v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987). The inherent power includes the "inherent power

28   to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly

1    inconsistent with the orderly administration of justice." *Anheuser-Busch, Inc. v. Natural Beverage*

2    *Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995). "It is well settled that dismissal is warranted where ... a

3    party has engaged deliberately in deceptive practices that undermine the integrity of judicial

4    proceedings .... " *Id*.

5        "Dismissal under a court's inherent powers is justified in extreme circumstances, in response

6    to abusive litigation practices, and to insure the orderly administration of justice and the integrity

7    of the court's orders." *Halaco Engineering Co. v. Castle*, 843 F.2d 376, 380 (9th Cir. 1988). In

8    *Anheuser-Busch, supra*, the court held that where a litigant's "pattern of deception and discovery

9    abuse made it impossible for the district court to conduct another trial with any reasonable

10   assurance that the truth would be available," it was "appropriate to reject lesser sanctions where

11   the court anticipates continued deceptive misconduct." *Id*. at 353.

12       In particular, "[ d]ismissal is an appropriate sanction for falsifying a [deposition, affidavit,

13   declaration]. Fed. R. Civ. P. 11, as well as the court's inherent powers, can be called upon to redress

14   such mendacity." *Combs v. Rockwell International Corp.*, 927 F.2d 486, 488 (9th Cir. 1991).

15   Where it is demonstrated that a fraud has been committed upon the court, both Rule 11 and the

16   inherent powers of the court support the sanction of dismissal and the entry of default judgment.

17   *Sun World, Inc. v. Lizarazu Olivarria,* 144 F.R.D. 384, 390 (E.D. Cal. 1992). The ability to impose

18   the sanction of dismissal and default judgment does not depend upon whether or not a court order

19   has been violated. A court need not order a litigant from submitting false documents or perjuring

20   themselves in order for those acts to be punishable by dismissal and the entry of default judgment.

21   The legal obligation to refrain from committing such acts is imposed upon every party to the

22   lawsuit. *See id*. at 390.

23       **B.**        **Courts Apply A Five Factor Test Relating To Dismissal Sanctions**

24       When considering dismissal sanctions, Courts apply the following five factor test: "(1) the

25   public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket;

26   (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring the disposition

27

28

DEFENDANT BASANT GAJJAR'S MOTION FOR TERMINATING SANCTIONS

1    of cases on their merits; and (5) the availability of less drastic sanctions." See *Dreith, supra*; 648

2    F.2d at 788; *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958, n.4 (9th Cir. 2006).[2]

3                                    **IV. ARGUMENTS**

4           **A.      Plaintiffs' Misconduct Compels Terminating Sanctions Because Plaintiffs**

5    **Have Made It Impossible To Know The Truth In This Case**

6           "It has long been understood that certain implied powers must necessarily result to our Courts

7    of justice from the nature of their institution, powers which cannot be dispensed with in a Court,

8    because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32,

9    43 (1991) (internal quotation and alteration marks omitted).

10          The "courts have inherent power to [enter sanctions] . . . when a party has willfully deceived

11   the court and engaged in conduct utterly inconsistent with the orderly administration of justice."

12   *Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334, 1338 (9th Cir. 1985); see *Unigard Sec. Ins.*

13   *Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.1992) (The "[c]ourts are invested

14   with inherent powers that are 'governed not by rule or statute but by the control necessarily vested

15   in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

16   cases.'") (quoting *Chambers*, 501 U.S. at 43). "This inherent power is not limited by overlapping

17   statutes or rules.  The Supreme Court explained 'that the inherent power of a court can be invoked

18   even if procedural rules exist which sanction the same conduct.'" *Haeger v. Goodyear Tire &*

19   *Rubber Co.*, 793 F.3d 1122, 1131-32 (9th Cir. 2015) (quoting *Chambers*, 501 U.S. at 49).

20          In the exercise of its inherent power, a court "may impose sanctions including, where

21   appropriate, default or dismissal." *Thompson v. Hous. Auth. of Los Angeles*, 782 F.2d 829, 831

22   (9th Cir. 1986), cert. denied *Thompson v. Hous. Auth. of Los Angeles*, 479 U.S. 829 (1986);

23   *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987) ("Courts have inherent

24   equitable powers to dismiss actions or enter default judgments[.]"); *CrossFit, Inc. v. Nat'l Strength*

25   *& Conditioning Ass'n*, 2019 WL 6527951, at *5, 17 (S.D. Cal. Dec. 4, 2019) (same). In deciding

26   whether to impose "severe" terminating sanctions, see *Conn. Gen. Life Ins. Co. v. New Images of*

27
     _____
28   [2] Although the five-factor test is usually used to review the propriety of dismissal sanctions under Rule
     37, the Ninth Circuit applies the test in cases of dismissal based on the Court's inherent sanctioning power
     as well. *See Leon, supra*, 464 F.3d at 958, n.4 (9th Cir. 2006).

                                                     6

1   *Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007), a court considers the following factors: "(1)

2   the public's interest in expeditious resolution of litigation; (2) the court's need to manage its

3   dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring

4   disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon v. IDX*

5   *Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (citing *Anheuser–Busch, Inc. v. Natural Beverage*

6   *Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)).   While a court need not make explicit findings

7   regarding each of the five factors, a finding of "willfulness, fault, or bad faith" is required for

8   imposition of terminating sanctions.  See *Leon*, 464 F.3d at 958; *Carl Zeiss Vision Int'l GmbH v.*

9   *Signet Armorlite*, Inc., 2009 WL 10668689, at *3 (S.D. Cal. Mar. 17, 2009) ("Bad faith, however,

10   is not a prerequisite to the imposition of dismissal sanctions.  It is sufficient that the conduct was

11   either willful or the fault of the offending party.")

12      **B.      Plaintiffs Have Submitted False And/Or Misleading Affidavits**

13      This is a clear case of attorney and litigation misconduct. On July 8, 2020, Plaintiffs filed an

14   affidavit in support of Proof of Service of Summons (*See* ECF 13). As explained in *Gajjar Decl.*,

15   p. 7-42, those affidavits contain false and misleading statements of material fact, and Plaintiffs

16   have violated Rule 11.  Alternatively, this Court has the inherent authority to sanction the Plaintiffs

17   and its counsel because of its false and misleading statements were made in bad faith.

18      "Thus, clearly, submitting these declarations was an act of bad faith which undermines the

19   confidence placed in our system of justice." (*See Newman v. Brandon*, 2012 WL 4933478, at *4

20   (E.D. Cal. Oct. 16, 2012) (submission of perjured testimony going to material issues in the case

21   "was an act of bad faith which undermines the confidence placed in our system of justice")).

22      In *Arnold v. County of El Dorado*, 2012 WL 3276979 at *4 (E.D. Cal. Aug. 9, 2012), the E.D.

23   Cal. Court held:

24          There need be no look at the merits of a lawsuit if material, substantial perjury is
           found. Id at 489. As stated in *Valley Engineers Inc. v. Electric Engineering Co.*,
25          158 F.3d at 1058: "There is no point to a lawsuit if it merely applies law to lies.
           True facts must be the foundation for any just result" . . . [W]hen a party falsely
26          testifies to a fact material to the substance of a litigation, such is anathema to the
           function of the courts. Perjury is much more than simply a "gotcha," harmful in
27          effect only for the reason that one got caught. Litigation is not a game in which
           perjury warrants a five-yard penalty for a minor untruth, fifteen yards if the perjury
28          was really serious. Rather, perjury on any material fact strikes at the core of the
           judicial function and warrants a dismissal of one's right to participate at all in the

truth-seeking process. If one can be punished for perjury with up to five years imprisonment, 18 U.S.C. §1621, it should not seem out of place that a civil action might be dismissed for the same conduct. *Id.*

The Motion to Quash (*See* ECF 18) was filed to dissuade the Plaintiffs from utilizing unethical measures to serve the Defendant elsewhere which would again include falsifying affidavits.

For the reasons discussed in *Decl., p.* 7-42, Defendant request that the Court enter an order (1) specifically finding that Plaintiffs filed one or more affidavits in which they knowingly and in bad faith made false or misleading statements of material fact; (2) disallowing all fees and expenses claimed by Plaintiffs; (3) dismissing this action in its entirety; (4) imposing such monetary sanctions as this Court deems appropriate and (5) imposing such other sanctions as this Court deems appropriate.

An attorney's filing of an affidavit (whether his own or another person's) that he knows to be false violates Rule 11. See *Margo v. Weiss*, 213 F.3d 55, 59 (2d Cir. 2000) (client and his attorney sanctioned under Rule 11 for filing "false affidavits . .... motivated by a desire to prolong what had become objectively baseless litigation"); *Copelco Capital, Inc. v. General Consul of Bolivia*, 940 F. Supp. 93, 95-96 (S.D.N.Y. 1996) (attorney ordered to show cause why he should not be sanctioned under Rule 11 for filing his own affidavit that misquoted a lease in a misleading way); *Chaudhry v. Ksenzowski (In the Matter of Ksenzowski)*, 56 B.R. 819, 835 (Bankr. E.D.N.Y. 1985) (sanctions imposed upon attorney under Rule 11 for, inter alia, filing false affidavit of service; the court stated, "[counsel] has shown himself indifferent to the accuracy of the representations he makes to this Court").

Additionally, if Rule 11 and 28 U.S.C. § 1927 did not apply, the Court would have inherent authority to sanction the Plaintiffs. An attorney's submission of an affidavit that is false or misleading as to a material fact should be considered just the sort of "litigation misconduct" that the Court has inherent authority to punish by imposing appropriate sanctions. See *Shepherd v. American Broad. Cos.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995) (district courts have "inherent power" to sanction attorneys or parties for "litigation misconduct"); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 115 F. Supp. 2d 898, 904 (S.D. Ohio 2000) ("A district court may award sanctions pursuant to its inherent powers when bad faith occurs").

1

**C.**     <u>**Evidence Fabrication of the alleged SlingFile Limited "Contract" (Account)**</u>

2

Plaintiffs on several occasions have misled and falsely stated to the Court that SlingFile
3
Limited has an active contract with Facebook by presenting a false evidence claiming SlingFile
4
Limited has a contract with Facebook thereby attaching Gajjar as personally liable as the sole
5
director/owner of the company. Plaintiffs have fabricated and proffered falsified evidence to the
6
Court asserting that SlingFile Limited has a contract with Facebook. Plaintiff's counsel has
7
knowingly made these statements under oath, and under a penalty of perjury. Defendant reiterates
8
that SlingFile and LeadCloak do not have a contract with Facebook and Instagram. Plaintiffs have
9
not produced such material or contract they claim and as such should be ignored. Plaintiffs
10
continue to perpetuate an assertion that SlingFile Limited has a contract with Facebook and/or
11
Instagram. This is just simply not factual.

12

The Court has consistently disregarded Gajjar's assertions regarding his accounts with
13
Facebook and Instagram. Since SlingFile and LeadCloak do not have a contract with Facebook
14
and Instagram, plaintiffs cannot pass on any alleged breach of contract to Gajjar or any legal
15
entities he owns, as such, SlingFile Limited has owned LeadCloak and Gajjar was not in a position
16
to direct company matters. Facebook has by misjoinder or joinder placed wrong parties or not
17
placed correct parties. Gajjar informed the Court and has clearly articulated in his Personal
18
Declarations on several occasions that he has held only two *personal/consumer* Facebook accounts
19
(Herter Decl. ¶¶ 5, and ¶¶ 7), the first one while living as a student in California in 2006 and another
20
while living in India in 2013 respectively, and only one personal/consumer Instagram account
21
while living in India in 2015 (Herter Decl. ¶¶ 10.). Gajjar has no knowledge of the other Instagram
22
account (Herter Decl. ¶¶ 11.).

23

Plaintiffs have suppressed facts that SlingFile Limited's "contract" (account) as Plaintiffs
24
claim to be was in fact an inactive account/void contract *ab initio* despite the fact that Gajjar has
25
always asserted that "Neither SlingFile nor LeadCloak has any contracts with Facebook or
26
Instagram." (*See* ECF 32-1, p. 9-10.) However, the Court sided with the Plaintiffs. Ultimately, the
27
Court still concurred with the Plaintiffs ignoring Defendant's assertions and ruled (*See* ECF 73,
28
Pg. 5, Ln. 4:9).

Additionally, Herter described that "Account 1" (Herter Decl. ¶¶ 6) had the role of administrator for "Account 4" (Herter Decl. ¶¶ 9).

Plaintiffs have wilfully misled the Court into believing that Defendant created SlingFile Limited account (Herter Decl. ¶¶ 9), which was not an active contract to begin with as this account was never approved. Gajjar then explained and provided evidence to the contrary to the Court in his personal declarations (*Decl*. ECF 77-1, p. 45–60; also see, *Decl.*, p. 43-59). It strains to reason as to how "Account 1" (Herter Decl. ¶¶ 6) could become an administrator of "Account 4" (Herter Decl. ¶¶ 9) when the account was not approved, and it could not be accessed in the first place!

Plaintiffs have made these false statements earlier in their pleadings that proves that they have fabricated evidence (*See* ECF 36, Pg 8, Ln 3:6). Additionally, they misled the Court through false or misleading statements stating that "Defendant … is the only Facebook user listed as the administrator for the account".

Defendant has issued notices about the falsification and/or fabrication earlier. *See*, ECF 86, Page 48 Ln 12:27 and Pg 49 Ln 1:27, and Pg 50 Ln 1:12; *See* ECF Decl 77-1; *See,* ECF 93. Plaintiffs have not rescinded these false statements or notified the Court, and they cannot rescind them now. As such, terminating sanctions are appropriate and warrants dismissal in its entirety.

Thus, dismissal or entry of judgment under the court's inherent powers is frequently invoked when parties rely on or create forged documents. *See Brady v. United States*, 877 F. Supp. 444 (C.D. Ill. 1994) (dismissal where plaintiff fabricated and destroyed evidence); *Aoude v. Mobil Oil Corp*., 892 F.2d 1115, 1117 (1st Cir. 1989) (dismissal affirmed where plaintiff attached forged document to his complaint and relied upon the document as the "centerpiece" of the litigation); *Pope v. Fed. Exp. Corp.,* 974 F.2d 982, 984 (8th Cir. 1992) (dismissal affirmed where forged document was attached to complaint and was the "linchpin of plaintiffs case").

Federal courts have repeatedly found that terminating sanctions are appropriate when a party commits the cardinal sin of litigation since "fabricating evidence has been referred to as the **most egregious misconduct** which justifies a finding of fraud upon the Court." *Kenno v. Colorado's Governor's Off. of Info. Tech*., 2021 WL 2682619, at *19 (D. Colo. June 30, 2021).

Even a combination of "misleading, inaccurate, and incomplete responses [to discovery requests], the presentation of fraudulent evidence, and the failure to correct the false impression" can constitute fraud on the court. *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir.1995). Indeed, even an employee's destruction of data on his employer-owned laptop amounted to willful spoliation of evidence that supported dismissal as sanction. *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006); see *Hutchinson v. Hensley Flying Serv., Inc.*, 210 F.3d 383, (9th Cir.2000) ("Using a falsified document in evidence is sufficient grounds for a dismissal sanction under Rule 11").

The only remaining requirement for terminating sanctions is that the violations must be "due to willfulness, bad faith, or fault of the party." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983). "[A]ll litigants, including pro se, have an obligation to comply with court orders. When they flout that obligation, they, like all litigants, must suffer the consequences of their actions." *McDonald v. Head Crim. Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988). The court in *Garcia* found "that the fabrications were prepared by the plaintiff willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes, and with a full understanding of the impropriety involved." *Garcia v. Berkshire Life Ins. Co. of Am.*, 2007 WL 6757307 (D. Colo. Nov. 29, 2007). Another court found that: "Because Plaintiff himself drafted these false declarations and obtained signatures on them using trickery, the Court finds that Plaintiff knew the documents were falsified. Thus, the Court has no hesitation in finding that Plaintiff's actions were willful and made in bad faith." *Newman v. Brandon*, 2012 WL 4933478, at *4 (E.D. Cal. Oct. 16, 2012).

D.      **Plaintiffs Have Suppressed Facts and Fabricated "Jurisdictional" Evidence**

The Plaintiffs filed this action on April 9, 2020. The Exhibits shown on the Complaint were taken from LeadCloak's *beta* version. During the pre-suit investigation, Facebook's employees studied the functions of LeadCloak. At the time, LeadCloak did not offer its Services in the U.S. Plaintiffs' employee Ilya Nesterov used subterfuge to create "jurisdictional" evidence by signing up an account in the Ukraine and then creating a sub-account using a California IP address. The plaintiffs neglected to notify the Court about this account. Plaintiffs were aware that LeadCloak

did not offer its services in California, yet they bypassed this security mechanism (See *Decl.*, p. 60-69) intentionally so that the Defendant cannot contest the jurisdictional argument and to verify Defendant answers truthfully during discovery. During the jurisdictional discovery, Defendant has truthfully disclosed the one and only US-based customer, which Plaintiffs have artificially fabricated. S*ee* ECF 67 Pg. 10, Ln. 2:14.

Federal courts have seemingly universally granted motions for terminating sanctions based upon evidence that a party has submitted fabricated documents.

A court has the "inherent authority" to issue "sanctions in response to abusive litigation practices." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). One such sanction is the authority to dismiss a case when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has wilfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Id.* (quoting *Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). "It is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders." *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982) (citations omitted). Terminating sanctions may issue only upon a finding of willful disobedience or bad faith. *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (the violations must be "due to willfulness, bad faith, or fault of the party").

Examples of such cases granting terminating sanctions for fabrication of document are: (1) *Lee v. Trees, Inc.,* 2017 WL 5147146, at *6 (D. Or. Nov. 6, 2017) granted terminating sanctions upon finding that: "There is no question here that Lee's conduct threatened to distort the rightful resolution of the case by forcing Defendants to rebut manufactured evidence. The false evidence very well may have obscured the truth and affected the resulting judgment, had it not been for Defendants' retention of Brillhart, who discovered the fabricated text messages. Lee's fabricated evidence forced Defendants, at least initially, to proceed in the case on the premise the evidence was authentic when it in fact was false, a result even more egregious than Leon contemplated.";

1    (2) *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1120 (1st Cir. 1989) dismissed for "fraud on the

2    court" where plaintiff attached a bogus agreement to the complaint. "Plaintiff argue[d] that his

3    deceit, if not entirely excusable, falls short of furnishing a basis for dismissal since '[t]he attaching

4    of the incorrect agreement to the Complaint … did not in any way interfere with [Defendant's]

5    ability to litigate the case nor did it interfere in any way with the District Court's ability to render

6    a 'rightful decision.'" The Court disagreed, because "*[t]he bogus agreement* clearly had the

7    capacity to influence the adjudication and to hinder [defendant's] presentation of its case. . . [and]

8    failure of a party's corrupt plan does not immunize the defrauder from the consequences of his

9    misconduct." *Id*. When the plaintiff "concocted the agreement, and thereafter when he and his

10   counsel annexed it to the complaint, they plainly thought it material. . . [and] 'are in no position

11   now to dispute its effectiveness.'" *Id*.; (3) In *Sun World, Inc. v. Lizarazu Olivarria*, 144 F.R.D.

12   384, 390 (E.D. Cal. 1992) (*emphasis added*) found that "*Lizarazu* admittedly and intentionally

13   defrauded the court by filing the Notice of Termination . . . [and] committed perjury in at least

14   two instances in furtherance of that fraud. . . *Lizarazu*'s egregious conduct, his lack of repentance

15   and his obvious disregard for this court's authority force the conclusion that no other sanction

16   would be efficacious." (4) Also, in *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th

17   Cir.1987) affirmed an $11,000,000 "default judgment entered against [the defendant] as a

18   sanction for his perjury during depositions and the false pleadings he filed with the court."; (5) In

19   *Jackson v. Murphy*, 468 Fed.Appx. 616, 620 (7th Cir.2012) affirmed the "sanction of dismissal"

20   where party "both perjured himself and forged a document" in the case; (6) Lastly, in *Pope v.*

21   *Fed. Exp. Corp*., 974 F.2d 982, 984 (8th Cir. 1992) found that dismissal of plaintiff's action was

22   appropriate where plaintiff introduced manufactured evidence and perjured testimony in an

23   attempt to enhance the case.

24   **E.        Plaintiffs Have Come To The Court With Willfulness, Bad Faith, And Fault**

25            As an initial matter, "[o]nly 'willfulness, bad faith, and fault' justify terminating sanctions."

26   *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096 (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 912

27   (9th Cir. 2003)). This prerequisite "does not require wrongful intent." *Sanchez v. Rodriguez*, 298

28   F.R.D. 460, 463 (C.D. Cal. 2014). Instead, "[d]isobedient conduct not shown to be outside the

1   control of the litigant is sufficient to demonstrate willfulness, bad faith, or fault." *Jorgensen*, 320

2   F.3d at 912 (citation omitted). "Delay, failure to appear for depositions, failure to answer

3   interrogatories resulting from a party being out of town and misunderstanding a party's own

4   counsel are not matters outside of a party's control." *Nat'l Corp. Tax Credit Funds III, IV, VI, VII*

5   *v. Potashnik*, 2010 WL 457626, at *4 (C.D. Cal. Feb. 4, 2010) (citing *Henry v. Gill Indus., Inc.*,

6   983 F.2d 943, 949 (9th Cir. 1993)).

7       Plaintiffs' acts and practices, throughout this litigation and as described and alleged in the

8   verified Counterclaim constituted unlawful, fraudulent, or unfair business practices. Plaintiffs'

9   conducts have been immoral, unethical, oppressive, unconscionable, or substantially injurious to

10   Defendant, and the uniform conduct of the Plaintiffs has proven to deceive not only the Defendant

11   but also this Honorable Court. Plaintiffs' acts were intentional, and proximately caused Gajjar to

12   suffer emotional distress and financial loss. Plaintiffs' actions were malicious, willful, wanton,

13   callous, in bad faith, and showed reckless disregard for Gajjar's rights. Gajjar has endured fear,

14   humiliation, embarrassment, mental pain, suffering, inconvenience, and financial injury,

15   including lost business profits. Based on the information found and verified, defendant Gajjar

16   believes Plaintiffs are liable for his injuries and damages.

17       Plaintiff's suppression of facts have been costly to the Court in time and resources, and

18   furthermore constitute a breach of its attorney's fiduciary duty to the Court.

19       Following the Cambridge Analytica scandal, numerous controversies and other scandals

20   involving Facebook's own use and sale of user information, and harsh scrutiny from regulatory

21   authorities around the world, Facebook appears to be engaged in a face-saving campaign by

22   attempting to blame others (such as Gajjar and LeadCloak) for Facebook's own decisions with

23   respect to user information. *Gajjar Decl. 95-135* provides an explanation of how Plaintiffs manage

24   its illegal advertising network and engages in fraudulent business activities.

25       Plaintiffs seek to hold Gajjar and, LeadCloak vicariously liable for all actions of third parties.

26   Any misconduct that may have breached Facebook TOS was committed by *third-parties*.

27       This lawsuit was strongly motivated by a *Bloomberg Businessweek* article published in March

28   2018 (A printable copy of this article is also attached as **Exhibit A**) titled "How Facebook Helps

1 Shady Advertisers Pollute the Internet." [3] The details are this story including internet fraudsters

2 describing Facebook's role are described in *Gajjar Decl. p. 95-135*. Facebook is aware of illegal,

3 manipulative, and otherwise inauthentic behavior on its platform, and maintains publicly that it

4 takes actions to "impose limitations on [scammer's] ability to use [Facebook]" or ban those actors

5 entirely[4]. Fraudsters described how Facebook would encourage their illegal ads. These fraudulent

6 practices have been carried out for over a decade, and Plaintiff appears to have a cosy relationship

7 with such software providers that make circumventing their ad reviews possible.

8     Plaintiffs disseminated a number of misleading statements on their press release website and

9 in a number of media sources at the time they filed this lawsuit. Plaintiffs assert that they have

10 recently invested more resources into weeding out scams, and naturally, by suing LeadCloak for

11 "Cloaking," it would make for a strong PR narrative that shows they are taking some strong

12 actions against alleged fraudsters and "This action is one of a number of efforts we are taking to

13 protect our users and hold those who abuse our systems accountable in court." [5] This is not the

14 case, though. [6] LeadCloak neither marketed nor designed its software to evade Facebook's ad

15 reviews, and Plaintiffs have presented no evidence that LeadCloak could do so through

16 "cloaking." As of the March 2018 publication date of this article, LeadCloak was not operational.

---

[3] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek (March 28, 2018), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them (emphasis added.)

[4] Facebook, Inauthentic Behavior Report (2020), https://about.fb.com/wp-content/uploads/2020/10/Inauthentic-Behavior-Report-October-2020.pdf

[5] Jessica Romero, Director of Platform Enforcement and Litigation at Facebook/Meta, Addressing Deceptive Advertising Practices, FB.com (Apr 9, 2020), https://about.fb.com/news/2020/04/addressing-deceptive-ad-practices/

[6] In the same *Bloomberg Businessweek* article, the author described the fraudulent and deceptive practices that occurs on Facebook and interviewed the founder of software provider Voluum (using an innocent sounding unsuspecting name) that can be used to circumvent Facebook's ad networks and reviews. In that article, Voluum's founder admits it provides such software, but Plaintiffs filed this lawsuit against LeadCloak when LeadCloak was just an IP Filtering and a Fraud Prevention Tool, and not a tracking software or anywhere close to advanced set of tools that Voluum offers. Plaintiffs and Voluum work in a partnership with each other fueling the fraud and scams, *see* Voluum and Facebook Integration Landing Page - https://voluum.com/integrations/facebook/.

1    Despite the information discovered during their pre-suit "investigation" and "jurisdictional

2    discovery," the plaintiffs have wilfully concealed and misrepresented LeadCloak's business

3    model. *See Decl. p. 68-69*. Further, defendant has addressed the Complaint several times and has

4    diligently addressed them again. *See Decl. p. 136-152*. There is no authority or term in the

5    dictionary describing or defining Cloaking. The actual usage and meaning of Cloaking are freely

6    and subjectively defined, and the breadth of its execution is quite expansive. Without visitor-

7    specific content, Facebook and many other websites on the Internet would cease to exist.

8    LeadCloak provided the same tools that Plaintiffs use to improve the user experience, including

9    geolocation, device identification, multivariate A/B split testing, and IP address filtration.

10   LeadCloak referred to this process as "cloaking." Plaintiff attempts to fabricate a precedent that

11   forbids "Cloaking" to render Cloaking unlawful, fraudulent, and deceptive, and clearly by

12   demonstrating half-truths in accordance with their conduct and false representations made

13   throughout the case. Plaintiffs utilize "Cloaking" on their websites by displaying a responsive

14   version to a mobile phone user or by displaying the page in Hindi for an Indian visitor who

15   accesses facebook.com, but they condemn its use and implementation by others. Plaintiffs do not

16   have the right to police the Internet in such a reckless and unreasonable manner. This is blatantly

17   hypocritical on its face.

18   In June 2021, Plaintiffs issued a subpoena to CloudFlare. Plaintiffs' subpoena request was

19   overbroad and sought information related to LeadCloak and SlingFile Limited, *non-parties of the*

20   *lawsuit. See* **Exhibit B.** Plaintiffs knew that SlingFile Limited and LeadCloak do not have a

21   contract with Plaintiffs and yet they willfully requested information on these non-parties in bad

22   faith. If this is not willful and acting in bad faith, then, it's hard to comprehend what is.

23   Plaintiffs have fraudulently accused LeadCloak of hosting web or landing pages ("content")

24   of its customers, notwithstanding the facts and without any evidence. LeadCloak never positioned

25   itself as a "web host" or content provider. The pre-suit investigation and "jurisdictional" discovery

26   have confirmed this. LeadCloak cannot thus be held vicariously accountable or responsible for

27   any claimed misconduct. See *Decl.* 136-140.

28

DEFENDANT BASANT GAJJAR'S MOTION FOR TERMINATING SANCTIONS

1

### F.     <u>The Court Should Terminate This Action Pursuant To Its Inherent Sanctioning Power And/or Rule 11</u>

The Court should also terminate this action pursuant to its inherent sanctioning powers and/or Rule 11 on the basis that Plaintiff has litigated this action in bad faith by committing multiple acts of perjury during this case.

<u>Penal Code section 118(a) states, in relevant part</u>:

> Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, wilfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury' and wilfully states as true any material matter which he or she knows to be false, is guilty of perjury.

California Penal Code section 118(b) states, in part, that "Proof of falsity may be established by direct or indirect evidence." The "wilfulness" element in Penal Code section 118 requires that the witness be conscious that the statement is false and with the intent that it be received as the truth. *See In re Lindley*, 29 Cal. 2d 709, 723 (1947). Under California Penal Code section 123, it is not important that a person accused of perjury did not know the materiality of the false statement made by him; or that it did not, in fact affect the proceeding in or for which it was made. "It is sufficient that it was material and might have been used to affect such proceeding." Cal. Penal Code § 123.

The following chart identifies some of the numerous instances of perjury committed by Plaintiff during this litigation along with some of the many examples of their false, misleading, and extremely evasive conduct throughout the proceeding.

According to Rule 11, sanctions may be imposed against attorneys, law firms, and parties, and is not limited to the signer of the document. See *In re Tuto Wells Contamination Litigation*, 120 F. 3d 368 (3d Cir. 1997); also see, *Chambers v. NASCO*, 501 U.S. 32 (1991).

| Testimony/Declaration | Reason why Declaration/Testimony is False, Misleading or Evasive or Perjury |
|---|---|

| False Affidavit in the *Proof of Service of Summons* (*See* ECF 13) | The statements are knowingly false and misleading on its face. *See Decl. p. 7-42.* |
|---|---|
| Defendant further claims that SlingFile Limited does not have any "contracts with Facebook or Instagram," but Defendant created a Facebook business account in the name of "SlingFile Limited" on June 22, 2019. Herter Decl. ¶ 9.   Defendant used a San Francisco phone number for this account and is the only Facebook user listed as the administrator for the account. *Id.* (*See* ECF 36, Pg. 8, Line 3:6). | Fabrication of SlingFile Limited's "contract" and concealment of material facts: Plaintiffs deliberately suppressed the fact that SlingFile Limited's contract/account was a void contract *ab initio*. Additionally, the plaintiffs fabricated the contract by stating that "Defendant … is the only Facebook user listed as the administrator for the account".  This statement is knowingly false and misleading on its face. |
| Facebook business account xxxxxxxxxxx5857 ("Account 4") was created on June 22, 2019 and uses the name "SlingFile Limited," email address basant@slingfile.com, and phone number 4158299419. Account 1 had the role of administrator for Account 4. Based on publicly available information, I know that 415 is an area code for the San Francisco Bay area.  (*See* ECF 36-2, Page 3, Ln 24-28). | Half-truth.  Suppression of facts. Fabrication of evidence.  This statement is knowingly false on its face. |
| "Plaintiffs conducted a diligent search, but because Defendant appears to have relocated after learning of this lawsuit (and possibly after Plaintiffs agreed to re-serve him), Plaintiffs have been unable to locate and re-serve him." | This statement is knowingly false and misleading on its face.  Plaintiffs were aware that Gajjar did not reside at Ashton at the first attempt of alleged Service of Process as Gajjar spoke to Hunton AK's attorney Mr.   Jewsittiprapai and |

DEFENDANT BASANT GAJJAR'S MOTION FOR TERMINATING SANCTIONS

| (ECF 28, Pg. 1, Ln 28, and Pg. 2, Ln 1:3) | explained that he does not live at Ashton. |

### G.       The Five factor Test Heavily Weighs in Favor of Dismissal

The Five-Factor Test Shows that terminating sanctions are warranted when a party falsely authenticates and submits fabricated and manufactured documents. In addition to the willfulness, bad faith, and fault prerequisite, the Ninth Circuit has stated that "[c]ourts are to weigh" the following "five factors in deciding whether to dismiss a case for failure to comply with a court order": (1) "the public's interest in expeditious resolution of litigation;" (2) "the court's need to manage its docket;" (3) "the risk of prejudice to the defendants;" (4) "the public policy favoring disposition of cases on their merits;" and (5) "the availability of less drastic sanctions." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig*., 460 F.3d 1217, 1226 (9th Cir. 2006) (citation omitted). *Leon v. IDX Sys. Corp.,* 464 F.3d 951, 958 (9th Cir. 2006) (citing *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)). This five-factor test is not a rigid, mechanical test but "a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998). "The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a . . . dismissal sanction. Thus, the key factors are prejudice, and the availability of lesser sanctions." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990).

"These factors are 'not a series of conditions precedent before the judge can do anything,' but a 'way for a district judge to think about what to do.'" *Id*. (quoting *Valley Eng'rs Inc. v. Elec. Eng'g Co.,* 158 F.3d 1051, 1057 (9th Cir. 1998)). The undersigned shall address each of the pertinent factors, in turn.

As explained below, the factors undoubtedly weigh in favor of the terminating sanction of dismissal with prejudice when a party has fabricated documents.

### 1.   First Factor: The Public's Interest in Expeditious Resolution

The Public's Interest in Expeditious Resolution of litigation always favors the imposing a sanction of dismissal or default. See e.g., *Pagtalunan v Galaza*, 291 F. 3d, 639, 642 (9th Cir. 2002); *In re PPA Products Liab Litig*., 460 F.3d 1217, 1227 (9th Cir. 2006).

1  In *Gonzales v. Mills,* 2011 WL 976713, at *5 (E.D. Cal. Mar. 16, 2011) (finding that "[t]he

2  public's interest in expeditious resolution of litigation favor[ed] dismissal" where the "case ha[d]

3  been pending for over a year and a half, yet it [was] apparent that the case [was] not ready for

4  trial"); *cf. Yourish v. Cal. Amplifier,* 191 F.3d 983, 990 (9th Cir. 1999) ("[T]he public's interest

5  in expeditious resolution of litigation always favors dismissal.").

6  "'The public's interest in expeditious resolution of litigation always favors dismissal.'"

7  *Pagtalunan v. Galaza*, 291 F.3d 639, 642 (9th Cir. 2002) (quoting *Yourish v. Cal. Amplifier*, 191

8  F.3d 983, 990 (9th Cir. 1999)).

9  Likewise, since addressing the fabricated evidence, Plaintiff presented "has consumed some

10  of the court's time that could have been devoted to other cases on the docket[,]"

11  **2.  <u>Second Factor: The Court needs to manage its Docket</u>**

12  Plaintiffs' conduct in failing to abide by the rules of this Court has prevented the Court from

13  managing its docket by preventing any merits-based resolution of his matter and thereby

14  needlessly clogging the Court's docket. See, e.g., *Gonzales*, 2011 WL 976713, at *5 (noting that

15  courts in this District carry "overly congested" dockets "and stalled cases due to a lack of

16  prosecution aggravate the situation"); cf. *Armstrong v. Spearman*, 2015 WL 5021664, at *2 (E.D.

17  Cal. Aug. 21, 2015).

18  The Northern District of California is one of the busiest federal jurisdictions in the United

19  States and its District Judges carry the heaviest caseloads in the nation, [so] the [c]ourt's interest

20  in managing its docket weighs in favor of terminating the action."). The undersigned therefore

21  finds that the first two factors weigh in favor of dismissal.

22  "District courts have an inherent power to control their dockets," and to that end "'dismissal

23  must be available to the district court in appropriate cases, not merely to penalize those whose

24  conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to

25  such conduct in the absence of such a deterrent.'" *Phenylpropanolamine Litig.*, 460 F.3d at 1227

26  (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per

27  curiam)). Defendants' conduct undermined the integrity of these proceedings, and any remedy

28  short of default would not adequately deter future fraudsters from producing false declarations to

1   manufacture contested issues in litigation. The second factor, the Court's need to manage its

2   docket, "also weighs in favor of dismissal." *Pagtalunan*, 291 F.3d at 642.

3   **3.   Fourth Factor: Public Policy in Favor of Disposing of Cases on the Merits**

4      The presumption in favor of disposition on the merits is outweighed where, as here, plaintiffs

5   have engaged in a pattern of deception.  See *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d

6   1051, 1057 (9th Cir. 1998). As one court found in dismissing an action where the plaintiff

7   submitted a false declaration, "while public policy favors disposition on the merits and therefore

8   weighs against dismissal, it is Plaintiff's own misconduct which is at issue here and which has

9   stalled the case." *Uribe v. McKesson*, No. 08-CV01285-SMS PC, 2011 WL 3925077, at *5 (E.D.

10  Cal. Sep. 7, 2011).  While even one forged declaration would be shocking enough, plaintiffs'

11  dishonest filings pervaded the defenses they raised during the proceedings and have persisted

12  through their failure to acknowledge or  remedy these issues throughout the proceedings.

13     Skipping to the fourth factor, there is, of course, a "strong public policy favoring disposition

14  of cases on their merits." *In re Sucato*, 152 F.3d 929, at *1 (9th Cir. 1998); see, e.g., *Eitel v.*

15  *McCool,* 782 F.2d 1470, 1472 (9th Cir. 1986) ("Cases should be decided upon their merits

16  whenever reasonably possible." (citing *Pena v. Seguros La Comercial, S.A*., 770 F.2d 811, 814

17  (9th Cir. 1985))). As a terminating sanction does not dispose of an action on its merits, this factor

18  "cuts against case-dispositive sanctions." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d at

19  1057 (citation omitted). Nonetheless, the Ninth Circuit has noted that "a case that is stalled or

20  unreasonably delayed by a party's failure to comply with deadlines and obligations cannot move

21  forward toward resolution on the merits." *In re Phenylpropanolamine,* 460 F.3d at 1228.

22     Consequently, this fourth "factor lends little support to a party whose responsibility it is to

23  move a case toward disposition on the merits but whose conduct impedes progress in that

24  direction." *Id*. (citations omitted). Here, Plaintiffs' failure to comply with the Rules has stalled

25  this litigation and made it a remote possibility, at best, that this matter will reach any conclusion

26  based on the merits. As such, the fourth factor is entitled to little weight in this analysis, see, e.g.,

27  id., and a dispositive sanction is appropriate if the remaining factors weigh in favor of dismissal,

28  see, e.g*., Leon v. IDX Sys. Corp.,* 464 F.3d 951, 960–61 (9th Cir. 2006) (stating that "the public

policy favoring disposition of cases on their merits, . . . standing alone, is not sufficient to outweigh the other four factors" (citation omitted)); *cf. Winters v. Jordan,* 2013 WL 5780819, at *10 (E.D. Cal. Oct. 25, 2013) ("Dismissal is proper 'where at least four factors support dismissal or where at least three factors strongly support dismissal.'" (quoting *Hernandez v. City of El Monte,* 138 F.3d 393, 399 (9th Cir. 1998))). Thus, as is always the situation "[w]here a court order is violated, the first two factors support sanctions and the fourth factor cuts against" a dispositive sanction. *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1412 (9th Cir. 1990). "Therefore, it is the third and fifth factors that are decisive." *Id.* On the other hand, "[t]he fourth factor, resolution of cases on their merits, always weighs against dismissal." *Dreith v. Nu Image, Inc.,* 648 F.3d 779, 788 (9th Cir. 2011). Overall, the factors weight clearly in favor of the sanction of dismissal.

### 4.   <u>Third Factor: Risk of Prejudice</u>

Turning next to the third factor—the risk of prejudice to the defendant—the Ninth Circuit noted that "[a] defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case." *In re Phenylpropanolamine (PPA) Prods. Liab*. Litig., 460 F.3d 1217, 1227 (9th Cir. 2006) (citations omitted). "Failing to produce documents as ordered is considered sufficient prejudice." Id. (citation omitted). "The law also presumes prejudice from unreasonable delay." Id. (citation omitted). "However, this presumption of prejudice is a rebuttable one and if there is a showing that no actual prejudice occurred, that factor should be considered . . . ." *In re Eisen*, 31 F.3d 1447, 1452–53 (9th Cir. 1994) (citation omitted). "The district court's finding of prejudice" shall be accorded "substantial deference because the district court is in the best position to assess prejudice." *In re Phenylpropanolamine,* 460 F.3d at 1228 (citation omitted). In the present matter, the prejudice factor weighs in favor of dispositive sanctions for three distinct reasons. First, Defendant suffered prejudice due to Plaintiffs' failure to comply with the Orders regarding the Requests. See, e.g., *Adriana Int'l Corp.,* 913 F.2d at 1412 (stating that "[f]ailure to produce documents as ordered . . . is considered sufficient prejudice" under the third factor (citing *SEC v. Seaboard Corp.,* 666 F.2d 414, 417 (9th Cir. 1982))). Second, Plaintiffs' conduct in filing a false statement in the affidavit has prejudiced Defendant by infringing on their ability to prepare and

1 execute its defenses, or to otherwise make litigation decisions that are informed by Plaintiffs'

2 conduct. See, e.g., *Armstrong v. Spearman*, No. 1:13–cv–00246–AWI–SAB (PC), 2015 WL

3 5021664, at *2 (E.D. Cal. Aug. 21, 2015) ("The failure to obtain information significantly impairs

4 the [d]efendants' ability to go to trial . . . and to make rightful and informed decisions as to

5 whether . . . defense[s] should be explored."). Finally, Plaintiffs' failure to comply with the Orders

6 has needlessly stalled this litigation, thereby creating a presumption of prejudice. See, e.g., *In re*

7 *Phenylpropanolamine*, 460 F.3d at 1227 ("The law . . . presumes prejudice from unreasonable

8 delay." (citations omitted)).

9 The prejudice inquiry turns on whether the misconduct impaired the defendant's "ability to go

10 to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959

11 (internal citations omitted). This is barely the beginning of litigation and, given the scope of

12 misconduct, any evidence plaintiffs present in response to the discovery or at any trial also will

13 not be credible.  *See, e.g., CrossFit*, 2019 WL 6527951, at *19 (finding prejudice warranting

14 terminating sanctions where "[g]iven the extensive perjury to date, the evidence supplied by the

15 [plaintiff] will also be inherently untrustworthy.'").

16 Some courts have referred to the factor weighing the risk of prejudice to the party moving for

17 dismissal as "not required … but an important factor." *Halaco Eng'g Co. v. Castle*, 843 F.2d 376,

18 382 (9th Cir. 1988) (finding prejudice factor is "purely optional"); *United States v. Nat'l Medical*

19 *Enters., Inc.*, 792 F.2d 906, 912–913 (9th Cir.1986) (stating prejudice is not required for

20 dismissal).

21 Regardless, multiple courts have found that the fabrication of evidence necessarily creates

22 prejudice towards the other party. Notably, the *Garcia* court held that: "The actual prejudice to

23 the defendants is overwhelming. They have been required to defend a lawsuit based on <u>false</u>

24 <u>evidence</u>. Nothing can be relied on as authentic—from the plaintiff's expert reports; to evidence

25 offered in support of her interrogatory answers; to the evidence offered to the court. The

26 defendants have been put to enormous additional effort and expense to ferret out the plaintiff's

27 lies and to double check every piece of information and evidence. I have absolutely no confidence

28 that the plaintiff would not attempt to offer additional false evidence at a trial. The risk that this

court might issue judgment against the defendants based on the plaintiff's fabrications and lies is simply too great to allow the case to proceed…. Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means." *Garcia v. Berkshire Life Ins. Co. of Am.*, 2007 WL 6757307, at *9 (D. Colo. Nov. 29, 2007), *aff'd in part and remanded*, 569 F.3d 1174 (10th Cir. 2009).

On appeal, the *Garcia* court further explained that: "The submission of falsified evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation. The prejudiced party is forced either to attempt independent corroboration of each submission, at substantial expense of time and money, or to accept the real possibility that … documents submitted by the opposing party are inaccurate." *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009). For each of these reasons, the undersigned finds that the third factor weighs in favor of dispositive sanctions.

## 5.   Fifth Factor: Availability of Lesser Sanctions

As to the fifth factor—the availability of less drastic sanctions—the Ninth Circuit stated that "[t]he districts court abuses its discretion if it imposes a sanction of dismissal without first considering the impact of the sanction and the adequacy of less drastic sanctions." *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131–32 (9th Cir. 1987) (quoting *United States v. Nat'l Medical. Enters., Inc.,* 792 F.2d 906, 912 (9th Cir. 1986)). This final factor includes the following three "subparts": (1) "whether the court has considered lesser sanctions;" (2) whether the court "tried" lesser sanctions; and (3) "whether [the court] warned the recalcitrant party about the possibility of case dispositive sanctions." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (citing *Valley Eng'rs Inc. v. Elec. Eng'g Co.,* 158 F.3d 1051, 1057 (9th Cir. 1998)). "While helpful and encouraged, explicit discussion of alternatives is not necessary for a dismissal order to be upheld." *In re Phenylpropanolamine*, 460 F.3d at 1229 (citing *Malone*, 833 F.2d at 132). Further, "[w]arning that failure to obey a court order will result in dismissal can itself meet the consideration of alternatives requirement." *Id.* (citations omitted);

see, e.g., *Estrada v. Speno & Cohen*, 244 F.3d 1050, 1057 (9th Cir. 2001) (stating that "explicit discussion by the district court of the feasibility of alternatives when ordering dismissal . . . would be superfluous or unnecessary" under some "circumstances," such as where the court warns "a party that a future failure to obey a court order will result in" termination of the case).

While less severe sanctions theoretically exist, anything less than terminating sanctions, in light of a party's wilful fabrication of evidence and perjury, is woefully inadequate. "[D]ismissal is the only sanction that adequately redresses the severity of Plaintiff's misrepresentations to this Court" of filing a false, misleading and fraudulently procured declaration. *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 2015 WL 12732433, at *26 (C.D. Cal. Dec. 14, 2015).

**H.**      **Monetary Sanctions Should Also Be Awarded To Defendant For Fees And Expenses Incurred Relating To Plaintiffs' Recalcitrant Conduct**

Although Defendant understands the potentially ineffectiveness of monetary sanctions alone against Plaintiff, Defendant submits that the Court should issue both dismissal and monetary sanctions. Under its "inherent powers" a District Court may award both dismissal sanctions and sanctions in the form of attorneys' fees against a party who acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *See Leon, supra*, 464 at 961 (affirming both dismissal of action sanction and monetary sanction award of $65,000).

To date, Defendant has incurred approximately $192,008.53 in total attorneys' fees and costs to litigate this matter since case's inception.

## V.  CONCLUSION

For all the foregoing reasons, Defendant respectfully request that the Court issue an Order dismissing this action with prejudice, award a monetary sanction against Plaintiffs in an amount that the Court finds just, and any other sanctions that the Court finds just and appropriate.

Respectfully Submitted,                    BASANT GAJJAR

Date: July 15, 2022                          By:  /s/ Basant Gajjar

                                                       Defendant in Pro Per

# <u>EXHIBIT A</u>

**Businessweek** | Feature

# How Facebook Helps Shady Advertisers Pollute the Internet

"They go out and find the morons for me."

By <u>Zeke Faux</u>

March 27, 2018, 4:00 PM GMT+7 *Corrected March 28, 2018, 11:15 PM GMT+7*



*Illustration: 731*

It was a Davos for digital hucksters. One day last June, scammers from around the world gathered for a conference at a renovated 19th century train station in Berlin. All the most popular hustles were there: miracle diet pills, instant muscle builders, brain boosters, male enhancers. The "You Won an iPhone" companies had display booths, and the "Your Computer May Be Infected" folks sent salesmen. Russia was represented by the promoters of a black-mask face peel, and Canada made a showing with bot-infested dating sites.

They'd come to mingle with thousands of affiliate marketers–middlemen who buy online ad space in bulk, run their campaigns, and earn commissions for each sale they generate. Affiliates promote some legitimate businesses, such as Amazon.com Inc. and EBay Inc., but they're also behind many of the shady and misleading ads that pollute Facebook, Instagram, Twitter, and the rest of the internet.





Robert Gryn says users of his tracking software place about $400 million worth of ads a year on Facebook. *Photographer: Angie Smith for Bloomberg Businessweek*

The top affiliates—virtually all of them young men—assemble a few times a year to learn the latest schemes and trade tips about gaming the rules set by social networks and search platforms. They think of themselves as kin to the surfers-slash-bank-robbers of the 1991 movie *Point Break*, just more materialistic, jetting from nightclub to Lamborghini race while staying a step ahead of the authorities. One San Diego crew took in $179 million before getting busted last year by the Federal Trade Commission for violating three laws governing online conduct.

The Berlin conference was hosted by an online forum called Stack That Money, but a newcomer could be forgiven for wondering if it was somehow sponsored by Facebook Inc. Saleswomen from the company held court onstage, introducing speakers and moderating panel discussions. After the show, Facebook representatives flew to Ibiza on a plane rented by Stack That Money to party with some of the top affiliates.

It was hard to believe that Facebook would cozy up to disreputable advertisers in mid-2017 as it was under intense scrutiny from lawmakers and the media over revelations that Russian trolls had used the platform to influence the 2016 presidential election. Officially, the Berlin conference was for aboveboard marketing, but the attendees I spoke to dropped that pretense after the mildest questioning. Some even walked around wearing hats that said "farmin'," promoting a service that sells fake Facebook accounts.

Granted anonymity, affiliates were happy to detail their tricks. They told me that Facebook had revolutionized scamming. The company built tools with its trove of user data that made it the go-to platform for big brands. Affiliates hijacked them. Facebook's targeting algorithm is so powerful, they said, they don't need to identify suckers themselves—Facebook does it automatically. And they boasted that Russia's *dezinformatsiya* agents were using tactics their community had pioneered.

When I asked who was at the heart of this game, someone who could explain how the pieces fit together, the affiliates kept nominating the same person. He was a Pole who'd started out as an affiliate

himself, they said, before creating a software program called Voluum—an indispensable tool they all use to track their campaigns, defeat the ad networks' token defenses, and make their fortunes. His name was Robert Gryn.

Gryn strutted into Station Berlin like a celebrity, wearing a trim gray suit, a shiny gold watch, and gold-rimmed mirrored sunglasses. He was trailed by a personal videographer, and men he didn't recognize ran up to him for bro hugs.

Only a few years ago, Gryn was just another user posting on Stack That Money. Now, at 31, he's one of the wealthiest men in Poland, with a net worth estimated by *Forbes* at $180 million. On Instagram, he posts pictures of himself flying on private jets, spearfishing, flexing his abs, and thinking deep thoughts. Last year he posed for the cover of *Puls Biznesu*, a Polish financial newspaper, with his face, neck, and ears painted gold. Gryn's prominent cheekbones, toned biceps and forearms, perfectly gelled pompadour, and practiced smile lend him a resemblance to his favorite movie character: Patrick Bateman, the murderous investment banker played by Christian Bale in *American Psycho*.

"I'm Robert Gryn, and when I'm not playing games or trying to build billion-dollar startups, I like to live life to the fullest," he tells the camera in the trailer for his vlog, drinking from a mug that says "I'M A F---ING UNICORN."

When I introduced myself in Berlin, Gryn suggested we decamp to a nearby bar, saying he was tired of getting so much attention. His online bravado was just an act, he said; in person, he preferred to affect a humble naiveté, as if he couldn't believe where luck had taken him. He told me that having money taught him that materialism is unfulfilling. "Life is like the most beautiful game," he said, sipping a beer in the sun, speaking in unaccented English he'd learned in international schools. "Money is just the high score."

## "It's like striking gold. You almost panic"

Gryn estimated that users of his tracking software place $400 million worth of ads a year on Facebook and an additional $1.3 billion elsewhere. (He later showed me reports that roughly support those figures.) It's not just affiliates who think Gryn is at the pinnacle of the industry. In June, just before the conference, Facebook's newly installed executive in charge of fighting shady ads, Rob Leathern, had invited him to the company's London office to explain the latest affiliate tricks.

The basic process isn't complicated. For example: A maker of bogus diet pills wants to sell them for $100 a month and doesn't care how it's done. The pill vendor approaches a broker, called an affiliate network, and offers to pay a $60 commission per sign-up. The network spreads the word to affiliates, who design ads and pay to place them on Facebook and other places in hopes of earning the commissions. The affiliate takes a risk, paying to run ads without knowing if they'll work, but if even a small percentage of the people who see them become buyers, the profits can be huge.

Affiliates once had to guess what kind of person might fall for their unsophisticated cons, targeting ads by age, geography, or interests. Now Facebook does that work for them. The social network tracks who clicks on the ad and who buys the pills, then starts targeting others whom its algorithm thinks are likely to buy. Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. "They go out and find the morons for me," I was told by an affiliate who sells deceptively priced skin-care creams with fake endorsements from Chelsea Clinton.



GRAPHIC BY BLOOMBERG BUSINESSWEEK

Facebook has recently put more resources into weeding out scams. But for years, even as the company's total ad revenue reached into the billions, it assigned few engineers to the matter. Ben Dowling, one of only three such employees when he was hired in 2012, says Facebook was focused on checking whether ads followed policies about things such as the percentage of text and images, and not on catching people with bad intentions. "They definitely didn't want them, that was totally clear," Dowling says, but "they weren't particularly effective at stopping them." (He left Facebook in 2014.) The company hired a few dozen reviewers in Austin and Hyderabad, India, to look over ads that users or algorithms had flagged as questionable and ban accounts that broke the rules. But affiliates evaded them using a subterfuge they call "cloaking." It was easy, especially if you were running Voluum.

Case 4:20-cv-02429-KAW  Document 94  Filed 07/15/22  Page 41 of 59

Gryn's software allows affiliates to tailor the content they deliver according to a number of factors, including the location or IP address associated with a user. The feature is useful for ad targeting–for example, showing Spanish speakers a message in their native language. But it's also a simple matter to identify the addresses of Facebook's ad reviewers and program campaigns to show them, and only them, harmless content.

Those who were caught and banned found that this was only a minor setback–they just opened new Facebook accounts under different names. Some affiliates would buy clean profiles from "farmers," spending as much as $1,000 per. Others would rent accounts from strangers or cut deals with underhanded advertising agencies to find other solutions.

Affiliates say Facebook has sent mixed signals over the years. Their accounts would get banned, but company salespeople would also come to their meetups and parties and encourage them to buy more ads. Two former Facebook employees who worked in the Toronto sales office said it was common knowledge there that some of their best clients were affiliates who used deception. Still, the sources said, salespeople were instructed to push them to spend more, and the rep who handled the dirtiest accounts had a quota of tens of millions of dollars per quarter. (He left Facebook last year.)



**Health & Gossip shop**
Sponsored · 🌐

"Silicon Valley CEOs have been quietly using this for years to get far ahead. He decided it was time for everyone in the US to have a fair chance.
* Students are using it to test into ivy league schools.
* Workers are using it to outshine their colleagues.
* Top CEOs are using it to work 16+ hours per day at 100% focus."

ELON'S SMART PILLS - APPROVED THIS YEAR"



## Elon Wants Everyone to Also Become Super Smart

Learn More

132K Views



A recent Facebook ad falsely suggested that the Tesla Inc. co-founder had talked up these "Smart Pills" on *60 Minutes*.

"We are deeply committed to enforcement against malicious advertisers and protection of people's data," David Fischer, Facebook's vice president for business and marketing partnerships, said in a statement. "We require all employees to follow our code of conduct and act in the best interest of both people and advertisers on Facebook." In February 2017, the company hired Leathern, a 43-year-old South African ad startup founder, who'd drawn attention for writing a series of online posts about what he described as "subprime ads." His work for Facebook has progressed amid unceasing criticism that the social network is helping create a society in which little can be trusted–a fever that reached a new intensity with the disclosure that a Trump-connected consulting firm, Cambridge Analytica, acquired the data of 50 million users without their permission.

In a sense, affiliate scammers are much like Cambridge Analytica. Because Facebook is so effective at vacuuming up people and information about them, anyone who lacks scruples and knows how to access the system can begin to wreak havoc or earn money at astonishing scale.

Leathern's job is to police a $40 billion-a-year ad platform that malicious players are constantly trying to subvert. In August he announced Facebook would start using artificial intelligence to disrupt cloaking. He declined to describe the process, saying he didn't want to give tips to bad actors, but he said the practice has been reduced by two-thirds. Facebook is adding 1,000 people to its ad review team, and it's banned ads for cryptocurrencies, which were popular with affiliates. Leathern has started engaging with journalists on Twitter—and occasionally he reaches out to individual users. "Thanks for letting us know about this," he wrote to William Shatner on March 21, after the actor complained about an ad that claimed he was dead. ("I'm not planning on dying," the actor replied to Leathern, "so please continue to block those kinds of ads.")

The majority of deceptive advertisers are caught in the review process, Leathern said, and Facebook has no interest in profiting from those who slip through. "We are working hard to get these people off the platform," he told me. "Winter is coming. They may get away with it for a while, but the party's not going to last."

I caught up with Gryn a second time in January in Santa Monica, Calif. He'd moved from Krakow to a $20,000-a-month beachfront apartment two months earlier and had already embraced the lifestyle, with a collection of flat-brimmed hats, a bike for riding on the boardwalk, and a ketogenic diet that forbade eating outside a single four-hour window.

Gryn employs 88 programmers nine time zones away in Poland, and when I visited, he'd fulfilled his management responsibilities by 9 a.m. as usual. He told me he'd decided to share his story because he felt a duty to show young Poles that they can succeed as entrepreneurs without relying on government graft. "This postcommunist mentality—I'm shattering that, unshackling part of our society from that trapped thinking," he said. "It's insane, really. It scares me sometimes."

## "Winter is coming. They may get away with it for a while, but the party's not going to last"

He said he'd grown up among Poland's elite, the son of a mobile phone executive, with a beach home in Spain and a cabin outside Warsaw where his grandmother taught him to forage for mushrooms. But he was depressed as a child, and when he was older, he had to be taught how to smile. Nothing he learned in school excited him. He paid even less attention in college and graduate school, though he obtained a master's in marketing. His real education came on the internet.

Around 2009, Gryn moved to Prague to intern at a company called Elephant Orchestra, which specialized in selling ads on misspelled domain names such as facebok.com. Elephant Orchestra was so profitable that its founder, then about 26, produced a feature-length movie about typo domains and got Václav Havel, the former Czech president and anti-communist hero, to make a cameo. The company's customers were affiliates. Soon, Gryn discovered Stack That Money and other forums

where they posted about their millions. The posters were people like Ryan Eagle, who'd made a fortune as a teenager in suburban Chicago and acquired a chrome-covered Bentley, iced-out watches, a diamond-encrusted chain-mail mask–and a nasty drug habit. ("When you're a real douche bag," says Eagle, now 30 and sober, "the douchey things find you.") Other posters came from the world of professional pickup artists–people such as Mark van Stratum, who wrote a memoir called *Drug of Choice: The Inspiring True Story of the One-Armed Criminal Who Mastered Love and Made Millions*.

Once Gryn realized that what the affiliates were doing wasn't hard, the possibilities excited him so much that he sometimes couldn't sleep. "It's like striking gold," he said. "You almost panic."

Gryn found the affiliates at a moment when they were discovering social media. They'd begun applying tricks on Facebook that had been invented by email spammers, who'd in turn borrowed the tactics of fax spammers in the 1980s and '90s. New forms of media have always been hijacked by misleading advertising: 19th century American newspapers were funded in part by dishonest patent medicine ads. Within days of Abraham Lincoln's inauguration, the makers of Bellingham's Onguent were placing ads claiming the president had used their product to grow his trendy whiskers.

Fake personal endorsements and news reports are still the most effective tricks. Dr. Oz, the *Shark Tank* judges, and *Fixer Upper* co-host Joanna Gaines are among the most popular imprimaturs, though Eagle favored Kim Kardashian. After she complained to TMZ that her name was being used without permission to promote colon cleanses, he bragged on an affiliate forum in 2009 that the ads were his.

The latest products include Enhance Mind IQ–or Elon's Smart Pills, as they were called in a recent Facebook ad falsely suggesting that the Tesla Inc. co-founder had talked them up on *60 Minutes*. The checkout page says the pills are free, though buyers must still submit a credit card number. Online reviews are full of victims complaining of the subsequent recurring $89-a-month charges. Other affiliates use deceptive pictures to sell junky watches, dresses, and flashlights from Chinese factories. *Shark Tank*'s Barbara Corcoran says she frequently fields complaints from people duped by skin-cream ads on Facebook featuring her face. Two of her own sisters fell for the scam, Corcoran told me. "I send out so many cease-and-desist letters," she said. "But it's very hard to track down the source."

Around 2011, Gryn started running a "Free iPhone" offer in Poland. It was his breakthrough. The lottery had real winners, but entrants had to agree to be billed a few zlotys ($1 or so) a week. It brought in more money than Gryn was earning at Elephant Orchestra, and he quit to do affiliate marketing full time. In 2012, when he was 24, his revenue hit $1 million. The next year his broker flew him to Las Vegas to celebrate with other affiliates. Photos show a nerdy-looking Gryn smiling next to an Oompa Loompa his hosts had hired for a candy-themed party. The group paid thousands of dollars at a club to chug vodka from light-up multiliter bottles as big as beagles. Gryn felt awkward and shy, but he knew he wanted more. "It was absolute decadence," he said. "I just wanted to ride that wave."

Also in 2013, Gryn bought out Codewise, a web development company in Krakow he'd hired to create a campaign-tracking tool. The software had modest but supremely useful features, such as tracking campaigns on multiple platforms—Facebook, Google, Twitter, etc.—in one place and altering content based on a user's country. Gryn branded it Voluum and began offering it to other affiliates. On the first day of sales, 1,000 customers signed up, at a minimum of $99 a month. (Gryn said some clients now pay thousands of dollars a year, based on usage.) He and his employees donned suits for the occasion, spraying Champagne around the office as the Twista song *Sunshine* played on repeat.

Voluum is intended for ad tracking and targeting, not trickery, Gryn said. Dishonest affiliates could apply other software to the same ends. "We're not in the business of policing the internet," he said. "If we ban people from Voluum, they'd be doing the same thing somewhere else the next day. At least we consolidate the bad apples in one place."

As affiliate marketing boomed, so did Codewise. Revenue reached $39 million in 2015, according to a statement Gryn provided me. Google banned Voluum over cloaking concerns, but that didn't derail the company—Facebook was where the action was. In January 2016, Gryn met with American investment bankers who told him they could get $200 million or more for Codewise, which he owns outright. He turned them down.

Gryn hired a public-relations agency and developed an online persona in keeping with his newfound wealth. For his 30th birthday, he rented a villa in Ibiza, hired 15 "pool girls" as entertainment, and flew in eight of his friends on a private jet for a weeklong party that cost $250,000. When he got back to Poland, he rented a giant billboard in Krakow and put up an ad with his face and the message "Don't Be a Corporate Slave. Join Poland's Fastest Growing Startup." In February 2017, *Forbes* put him on the cover of its Polish edition, naming him the country's 57th-richest man. He started getting recognized around Krakow and receiving fan mail from young people inspired by his story.

Inevitably, there was a backlash. One writer for a technology website called Spider's Web said Gryn's company facilitated fraud and scams. Others made fun of his Instagram account and its evident lack of self-awareness. Gryn fired his PR shop and called his critics "gypsies" in an online post. He posted a slogan on his office wall: "If nobody is criticizing you, you're not doing anything extraordinary."

Still, the disapproval hurt. He went to Phuket, Thailand, cleared his mind by training as a Muay Thai fighter for three weeks, and decided to move to California, where he'd fit in better. "In Poland, people can't stomach success," he said. "They associate it with stealing or thievery."

Sitting on a bench on the Santa Monica pier after a ride on the Ferris wheel, I asked Gryn about the ethics of affiliate marketing. He said he'd stopped doing it himself, because he started to get handwritten complaints from people who'd entered his iPhone sweepstakes and couldn't figure out

how to cancel the recurring charges. "I had no idea that this is what it's doing to people," he said. "As an affiliate marketer, you just look at the numbers. You don't see the faces. You don't see the people that you're potentially financially hurting. It just sucks money out of the poorest people."

But affiliates, he continued, aren't really to blame. They're just taking advantage of opportunities created by large corporations in a capitalistic system built around persuading people to buy things they don't need. Gryn said he daydreams about changing directions and doing something positive for the world. He's considering investing in sustainable fish farming or going back to school to study mushrooms, like the ones he used to forage for with his grandmother. "Everything I do is futile," he said, staring out at the ocean, listening to seagulls caw. "No matter how successful a company I build in this space, I am facilitating what I deeply believe is a poorly designed system."

The moment passed quickly. "You can't abandon the skill set that makes you successful," he said. "You'd have to be some sort of hippie." As we walked back along the boardwalk to his apartment, he talked about his plan to raise tens of millions of dollars for Codewise by creating a cryptocurrency. Gryn said the token will enable him to revolutionize the affiliate-marketing business, cut out other middlemen, and build a billion-dollar company. Also, there was his 32nd birthday to plan. He was thinking of going back to Ibiza.

*(Corrects to remove reference to Jim Stark in the 26th paragraph.)*

Terms of Service  Do Not Sell My Info (California)   Trademarks  Privacy Policy
©2022 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices      Help

# EXHIBIT B

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| Facebook, Inc. and Instagram, LLC | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No. 4:20-cv-02429-KAW |
| Basant Gajjar, d/b/a "LeadCloak" | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                          Cloudflare, Inc.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment "A"

| Place: Hunton Andrews Kurth, LLP<br>550 South Hope Street, Suite 2000<br>Los Angeles, CA 90071 | Date and Time:<br><br>06/14/2021 8:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    06/03/2021

|  *CLERK OF COURT* | OR | /s/ Jeff R. R. Nelson |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Plaintiffs

Facebook, Inc and Instagram, LLC                                        , who issues or requests this subpoena, are:

Jeff R. R. Nelson,  550 S. Hope St., Ste. 2000, Los Angeles, CA 90071, jnelson@huntonAK.com,  (213) 532-2000

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.  4:20-cv-02429-KAW

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A
## DEFINITIONS

1.      The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary so as to bring within the scope of the Documents To Be Produced ("Request") all responses that might otherwise be construed to be outside of its scope.

2.      The terms "any," "all," and "each" shall be construed broadly, and mean any, all, and each as necessary so as to bring within the scope of the Request all responses that otherwise could be construed to be outside of its scope.

3.      The term "communication" has the broadest meaning permitted under the Federal Rules of Civil Procedure, and includes any transmission of information between two or more persons, whether by, without limitation: personal meeting, telephone, letter, telegraph, e-mail, electronic bulletin board, electronic "chat room," messaging app, text message, Slack, inter-office or intra-office correspondence, cable, radio, draft emails, any other form of electronic correspondence, teleconference, facsimile, telex, or any other means whatsoever.

4.      The terms "concerning" and "relating to" shall be read and applied as interchangeable and shall be construed in the broadest sense to mean discussing, supporting, describing, concerning, consisting of, relating to, referring to, reflecting, regarding, pertaining to, containing, analyzing, evaluating, studying, recording, memorializing, reporting on, commenting on, reviewed or prepared in connection or conjunction with, evidencing, setting forth, contradicting, refuting, considering, recommending, or constituting, in whole or in part.

5.      The term "document" shall have the broadest meaning permitted under the Federal Rules of Civil Procedure and relevant case law, and shall include without limitation all written or graphic matter, whether stored, displayed, communicated, or transmitted, of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, including: electronically stored information,

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

1
ATTACHMENT A

written communications, letters, memoranda of conversations, interoffice communications, records, statistical and financial statements, charts, graphs, reports, minutes, emails, voicemails, sound or video recordings of any type, contracts, agreements, computer code, computer diskettes, CDs or DVDs, or material similar to any of the foregoing, however denominated, by whomever prepared, and to whomever addressed, which are in your possession, custody or control or to which you have, have had, or can obtain access.

6.      The term "including" means including but not limited to.

7.      The term "Person" means any natural person or any business, legal, or governmental entity or association or its agents, employees, servants, or other representatives.

8.      The terms "You" or "Your" mean Cloudflare, Inc. and its agents, attorneys, representatives, entities, and all others acting or purporting to act on its behalf.

9.      The term "Customer 1" means the person who currently subscribes or previously subscribed to Your services with respect to the website leadcloak.com, which resolved to IP address 104.26.4.238.

10.      The term "Customer 2" means the person who currently subscribes or previously subscribed to Your services with respect to the website lcjscdn.com, which resolved to IP address 104.26.6.40.

## **INSTRUCTIONS**

1.      In the above Definitions, the singular form of a word shall be construed as a plural, and the plural as the singular, as necessary, to bring within the scope of these Requests all documents and responses which might otherwise be considered to be beyond their scope.  Additionally, the use of a verb in any tense shall be construed as the use of the verb in all other tenses, as necessary, to bring within the scope of these Requests all documents and responses that might otherwise be considered to be beyond their scope.  The use of capital letters, lower case letters or quotation marks in

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

2

these Requests shall not be construed to limit the scope of any specific Request contained herein.

2.     Each reference to a corporation, partnership, unincorporated association, government agency, or other fictitious person shall be deemed to include any of its subsidiaries, affiliates, predecessors, successors and assigns, and, with respect to each such entity, its officers, directors, shareholders, employees, partners, limited partners, representatives, agents, accountants, attorneys, and any other person who acted or purported to act on its behalf.

3.     Each reference to a natural person shall be deemed to include that person's agents, attorneys, and any other person who acted or purported to act on that person's behalf.

4.     Each of the Requests seeks all documents, wherever located, which are in Your possession, custody or control, or in the actual or constructive possession, custody or control of You or any of Your affiliates, or present or former attorneys, agents, representatives, advisors, or employees, and third-party service providers with which you have an account, including, for example, telephone and cable carriers, internet service providers, email carriers, banks, insurance companies, or any other institution with which You have an account and the right to access Your account records.

5.     If You believe that any person or entity might have possession, custody, or control of any document that is not within Your custody or control but is otherwise responsive to any part of the Requests, You shall so state and shall identify the person or entity that You believe might have custody or control of that document.

6.     In the event that any document requested herein was formerly in Your possession, custody, or control and has been lost, destroyed, or otherwise disposed of, You are requested to furnish a list identifying each such document and stating the following information with respect to each such document:

3

ATTACHMENT A

a.     the title of the document and the nature and general subject matter of its contents;

b.     the identity or identities of the person(s) who prepared or authored the document, and, if applicable, the persons to whom the document was sent or was intended to be sent;

c.     the date on which the document was prepared or transmitted; and

d.     the date on which the document was lost, destroyed or otherwise disposed of, the manner and conditions of, and reasons for such destruction or other disposition, and the persons requesting and performing the destruction or other disposition.

7.     You shall produce all documents in the order and manner that they are kept in the usual course of business. You shall produce all physical documents in their original folders, binders, covers, or containers (or You shall provide properly sequenced photocopies thereof). Documents produced shall be organized so that the files in which they were located can be ascertained, as well as their relative order in such files and how such files were maintained.

8.     Electronically stored information should be produced in the same electronic form as it exists in Your computers, original files, or other storage media, and the production should preserve the integrity of the underlying electronically stored information, *i.e.*, the original formatting, email header, family information, and the revision history. Metadata shall be included with all files. Spreadsheet files, such as those created using Microsoft Excel, and database files, such as those created using Microsoft Access, shall be produced in native format.

9.     You shall produce as a separate document any document that contains any notation, addition, insertion, or marking of any kind that renders it not identical to a version of that document without such marks.

10.     If any portion of any document is responsive to the Requests, You shall produce the entire document including, without limitation, all cover sheets,

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

4

ATTACHMENT A

appendices, or attachments.  Any document that is attached electronically or physically, by staple, clip or otherwise, to a document requested herein shall also be produced (attached in the same manner as the original) regardless of whether the production of that document is otherwise requested herein.

11.     If You have no documents that are responsive to a Request, You shall so state.

12.     These Requests are continuing in nature to the extent provided in Fed. R. Civ. P. 26(e), and supplemental productions of documents and/or responses shall be required immediately if, after responding to the Requests, You, or anyone acting on Your behalf, directly or indirectly, should acquire, obtain, generate, or become aware of any additional documents that are responsive to any part of any of the Requests.

13.     If you claim that a requested document is privileged or constitutes an attorney's work product and, as a result, do not produce the document, please provide a privilege log pursuant to Fed. R. Civ. P. 26(b)(5) that (i) describes such document by date, type (*e.g.*, memorandum, letter, note, etc.), author, addressee, recipients, and subject matter, and (ii) states the basis of the purported privilege or claim of work product.

14.     You shall respond to the Requests reasonably and not strain to interpret them in an artificially restrictive manner to avoid disclosure of relevant and non-privileged documents.  You shall not produce documents in a manner designed to hide or obscure the existence of particular documents, or to accomplish any other improper purpose.  You shall base Your discovery objections on a good faith belief in their merit and will not object solely for the purpose of withholding or delaying the disclosure of relevant information, or for any other improper purpose.

15.     If You object to any Request, You must state the basis for the objection with specificity.  If You object to a portion of a Request, You shall produce all documents responsive to that portion of the Request to which no objection is lodged. If You object to any Request as overbroad, You shall respond to the Request as

ATTACHMENT A

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

narrowed to conform to the objection. If You object to any request as ambiguous, You shall set forth Your construction of the "ambiguous" term and respond to the Request as clarified by Your chosen construction.

16.    The documents requested herein are documents dated, prepared, or referring to events that occurred during the period from May 1, 2016 to the date of service of these Requests (the "Relevant Period").

## DOCUMENTS TO BE PRODUCED

1.    Documents sufficient to identify the full name and contact information for Customer 1, including physical addresses, web addresses, email addresses, and telephone numbers.

2.    Documents sufficient to identify the full name and contact information for Customer 2, including physical addresses, web addresses, email addresses, and telephone numbers.

3.    Documents sufficient to identify all IP addresses used by Customer 1, including session date and time stamps at the time of registration.

4.    Documents sufficient to identify all IP addresses used by Customer 2, including session date and time stamps at the time of registration.

5.    Account history of Customer 1, including dates accounts opened or closed.

6.    Account history of Customer 2, including dates accounts opened or closed.

7.    Documents sufficient to identify all IP addresses Cloudflare assigned to Customer 1.

8.    Documents sufficient to identify all IP addresses Cloudflare assigned to Customer 2.

9.    All documents and communications with Basant Gajjar.

10.    All documents and communications with Slingfile Limited.

11.    All documents and communications with Customer 1.

ATTACHMENT A

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

12.     All documents and communications with Customer 2.

13.     All agreements and contracts with Basant Gajjar.

14.     All agreements and contracts with Slingfile Limited.

15.     All agreements and contracts with Customer 1.

16.     All agreements and contracts with Customer 2.

17.     Documents sufficient to identify all sources of payment for your services relating to leadcloak.com, including any name(s) associated with the source of payment.

18.     Documents sufficient to identify all sources of payment for your services relating to lcjscdn.com, including any name(s) associated with the source of payment.

19.     Documents sufficient to show the physical location of the server for IP address 104.26.4.238.

20.     Documents sufficient to show the physical location of the server for IP address 104.26.6.40.

21.     All documents relating to specifications provided by Customer 1 as to the location of Cloudflare servers that hosted data for leadcloak.com.

22.     All documents relating to specifications provided by Customer 2 as to the location of Cloudflare servers that hosted data for lcjscdn.com.

23.     All IP address geolocation data for California visitors to leadcloak.com.

24.     All IP address geolocation data for California visitors to lcjscdn.com.

25.     Documents sufficient to identify the host provider of the website leadcloak.com.

26.     Documents sufficient to identify the host provider of the website lcjscdn.com.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

7

ATTACHMENT A

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to this action.  My business address is 550 South Hope Street, Suite 2000, Los Angeles, California 90071-2627.

On June 3, 2021, I served document(s) described as:  **SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION TO CLOUDFLARE, INC.** on interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

☒ **By MAIL:**  by placing true and correct copy(ies) thereof in an envelope addressed to the attorney(s) of record, addressed as stated below.

☒ **By EMAIL:**  by causing a true and correct copy thereof to be transmitted electronically to the attorney(s) of record at the e-mail address(es) indicated below.

☐ **By ELECTRONIC SERVICE:**  by causing a true and correct copy thereof to be transmitted electronically to the attorney(s) of record in this action via the court's CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 3, 2021, Los Angeles, California.

_____
MARK JOHNSON

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

# **SERVICE LIST**

Brendan F. Macaulay                    Attorneys for Defendant Basant
Nossaman LLP                           Gajjar
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438
bmacaulay@nossaman.com

Andrew B. Gordon
Gordon Law Group, Ltd.
400 Central Ave, Suite 340
Northfield, IL 60093
Telephone: (847) 580-1279
Facsimile: (847) 305-1202
abg@gordonlawltd.com