**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Brandon M. Marvisi (State Bar No. 329798)
bmarvisi@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

Attorneys for Plaintiffs
Meta Platforms, Inc. (f/k/a Facebook, Inc.)
and Instagram, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation; INSTAGRAM, LLC, a Delaware limited liability company,<br><br>          Plaintiffs,<br><br>     v.<br><br>BASANT GAJJAR, d/b/a "LeadCloak",<br><br>          Defendant. | Case No.: 4:20-cv-02429-KAW<br><br>**INITIAL JOINT CASE MANAGEMENT STATEMENT**<br><br>Date:     October 11, 2022<br>Time:    1:30 p.m. |

Plaintiffs Meta Platforms, Inc. (f/k/a Facebook, Inc.) and Instagram, LLC and Defendant Basant Gajjar submit this Joint Case Management Statement, pursuant to Fed. R. Civ. P. 26(f) and the Standing Order for All Judges of the Northern District of California. Plaintiffs held a Rule 26(f) conference with Gajjar's counsel on March 26, 2021. In addition, Plaintiffs shared this Case Management Statement, which incorporated recent developments, with Gajjar directly on September 28, 2022 and invited him to discuss.

### 1. Jurisdiction and Service

This Court has federal diversity jurisdiction under 28 U.S.C. § 1332 over all causes of action alleged in the complaint because complete diversity exists between the parties, and the amount in controversy exceeds $75,000.

No parties remain to be served. Gajjar executed a waiver of the service of summons on January 22, 2021. ECF No. 31 (Waiver of Summons). And this Court already determined it has personal jurisdiction over Gajjar based on his consent to the same. ECF No. 73 (order denying defendant's motion to dismiss).

### 2. Facts

Plaintiffs' Statement: On April 9, 2020, Plaintiffs filed this action against Gajjar for breach of contract. As detailed in the complaint, since May 2016, as the founder and system architect of "LeadCloak," Gajjar enabled and assisted fraudulent advertisers to circumvent Facebook's advertisement review process using a technique known as "cloaking." ECF No. 1 (Complaint) ¶ 1. Cloaking is a bait-and-switch technique used to hide from Plaintiffs the true nature of the website linked to an ad, while presenting different content to users who clicked on the ad. *Id*. Gajjar developed, marketed, and sold cloaking software and services that prevented Plaintiffs from reviewing the true landing pages for ads posted on Plaintiffs' platforms. *Id*. Gajjar's actions prevented Plaintiffs from detecting and rejecting deceptive, harmful, and otherwise improper ads with landing pages that promoted, among other things, deceptive diet pills and pharmaceuticals, cryptocurrency investment scams, and misinformation about the economic impact of COVID-19. *Id*. ¶¶ 1-2. Plaintiffs bring this action for monetary and injunctive relief to stop Gajjar's abuse and

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

misuse of their platforms and products and violations of their Terms and Advertising Policies. *Id*. ¶ 3.

Gajjar's Statement of Facts:

This lawsuit was strongly motivated by a *Bloomberg Businessweek* article published in March 2018 titled "How Facebook Helps Shady Advertisers Pollute the Internet." [1] Plaintiff's substantial part of the revenues are generated by deceptive advertisers, which affects their bottom-line and pays for the whole party. Facebook is aware of illegal, manipulative, and otherwise inauthentic behavior on its platform, and maintains publicly that it takes actions to "impose limitations on [scammer's] ability to use [Facebook]" or ban those actors entirely[2]. Fraudsters described how Facebook would encourage their illegal ads. These fraudulent practices have been carried out for over a decade, and Plaintiff appears to have a cosy relationship with such software providers that make circumventing their ad reviews possible.

Briefly, LeadCloak.com was a small Hong Kong-based, unprofitable venture and an internet start-up launched in May 2018 that offered fraud prevention, IP address filtering, and a bot mitigation software application. LeadCloak was built on the premise that website operators should have the right to block unwanted visitors from their websites. Before shutting down on 23 Oct 2021, in prior years, LeadCloak never ran and never interfaced on the Plaintiffs' Platform.

LeadCloak's business practices have been open and known to the general public outside the United States since it's inception in May 2018. LeadCloak was a platform-neutral generic bot defense and IP filtering platform, and only provided API access to its customer base of less than 30 customers who were mostly individuals and small business owners. LeadCloak did not offer web hosting services and never hosted its customer's landing pages.

After the *beta* launch in May 2018, Facebook apparently suspected that LeadCloak was violating one or more of its policies and signed up on LeadCloak using subterfuge to perform an

---

[1] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek (March 28, 2018), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them (emphasis added.)

[2] Facebook, Inauthentic Behavior Report (2020), https://about.fb.com/wp-content/uploads/2020/10/Inauthentic-Behavior-Report-October-2020.pdf

INITIAL JOINT CASE MANAGEMENT STATEMENT

audit in July 2018. Facebook's employee Ilya Nesterov studied the functions of LeadCloak and audited the LeadCloak's software during the period in which he remained as a customer from Jul 2018 to Oct 2018. During this period, he also sent in a support ticket to LeadCloak requesting LeadCloak's customer support more information on how the product worked including instigating LeadCloak's customer service to commit an act of bad faith and fraud by asking LeadCloak to explain how the software can be used for circumventing the Plaintiff's platform's ad reviews. At that audit in 2018, LeadCloak explained in detail its business model to Facebook, including LeadCloak's inability to circumvent the Plaintiff's platform and referred him to LeadCloak's TOS that LeadCloak cannot be used for nefarious purposes. Facebook appears to have acknowledged, tested LeadCloak's software, and approved LeadCloak's business model at that time (which, as relevant to this lawsuit, were vague and ambiguous at best), which proved that LeadCloak was unable to circumvent Facebook's ad reviews despite referencing 'Cloaking' on LeadCloak's website.

Following Facebook's Cambridge Analytica scandal, numerous controversies and other scandals regarding Facebook's own use and selling of user information, and harsh attention from regulatory authorities throughout the world, Facebook now appears to be engaged in a face-saving campaign meant to try to blame others (such as LeadCloak) for Facebook's own decisions with respect to user data and fraudulent business practices in past years.  As far as Gajjar can tell, despite Gajjar and LeadCloak not having misused Facebook user data, and not having done anything with Facebook user data, Gajjar and LeadCloak are now apparently Facebook's desired scapegoat.

Throughout this litigation, Plaintiffs and its' counsel have engaged in a shocking pattern of using money, influence, dishonesty, harassment, and threats to achieve their litigation goals. Plaintiffs have willfully misled the Court concerning critical issues at different stages of this litigation through the submission of knowingly false and forged declarations.  Under Ninth Circuit precedent, such conduct warrants dismissal against Plaintiffs under the Court's inherent authority, yet the Court has sided with the Plaintiffs.

Plaintiffs seek to hold Gajjar and, LeadCloak vicariously liable for all actions of third parties. Any misconduct that may have breached Facebook TOS was committed by *third-parties*. Despite the information discovered during their pre-suit "investigation" and "jurisdictional discovery," the

plaintiffs have willfully concealed and misrepresented LeadCloak's business model. In Defendant's view, this lawsuit is a mean-spirited overkill designed to punish a foreign national for the prior actions of third party advertisers over whom he has no control (and could not be subject to any injunction).  As of October 2022, Plaintiffs had a market capitalization of ~$350 billion.  Defendant cannot come close to resisting Plaintiffs' litigation strategy, assisted by an AmLaw 100 international law firm and a seemingly bottomless war chest. Importantly, the stated aim of this litigation is (and was) already achieved.  Since 2018, LeadCloak software could not be purchased by customers/IP addresses based in the US (defeating special jurisdiction).  On October 23, 2021, LeadCloak's website shut down for good. There is nothing left for this Court to enjoin.  Nevertheless, over the last two years, Defendant Gajjar repeatedly agreed to a proposed injunction. There is no purpose in persisting with this lawsuit. There is no basis for any more discovery – particularly the overbroad merits discovery being sought by Plaintiffs.

- The lawsuit is primarily based on salacious allegations about a *beta*/test version of software that was never implemented once LeadCloak.com went live in December 2018;
- By June 2018 – years before the suit was filed – LeadCloak edited its beta software to prevent US-based customers from purchasing the software, including IP addresses based in the US;
- All of the alleged misuse of LeadCloak software on Facebook and Instagram was admittedly performed by third-party customers who Plaintiffs refuse to identify.  None of the misuse was allegedly performed by Defendant Gajjar, or even LeadCloak itself;
- Since inception, LeadCloak's terms and conditions prevented the alleged misuse of LeadCloak software, and contractually enabled LeadCloak to terminate the account/license of any offending customer.  LeadCloak's Terms of Service section 11.11 specifically mentioned that LeadCloak's software could not be used for breaching or otherwise circumventing any security or authentication measures;
- In May 2020, LeadCloak's homepage was amended to further confirm that the company's anti-fraud solutions are not meant to breach or circumvent the regulations of non-nefarious networks like ad networks;

- On multiple occasions during this lawsuit, Defendant Gajjar agreed to an injunction to stop the claimed conduct, yet Plaintiffs persisted with litigation;
- On October 23, 2021, LeadCloak shut down its website in the face of unyielding litigation and expense caused by Plaintiffs in this litigation.

The following principal factual issues in dispute were already resolved prior to filing this Joint Case Statement:

- LeadCloak is not a dba of Gajjar *personally*. LeadCloak was owned by SlingFile Limited, a Hong Kong corporation;
- How LeadCloak allegedly helped advertisers block Facebook IP addresses, and there were no factual proofs provided by the Plaintiffs;
- Whether SlingFile Limited, a Hong Kong-based corporation, who owns LeadCloak, has a contract with the Plaintiffs, and SlingFile Limited does not have a contract with Plaintiffs.

The principal factual issues in dispute are:

- Whether Facebook's Terms of Service and Platform Policies at issue were valid, enforceable contracts with Gajjar, and without including an indispensable party SlingFile Limited as the correct party to the lawsuit, who actually owns LeadCloak where Gajjar is merely an employee of SlingFile Limited;
- The meaning of Facebook's relevant provisions of its Indian Terms of Service and Platform Policies;
- Whether LeadCloak's business practices breached any valid contracts Gajjar *personally* had with the Plaintiffs;
- Whether Gajjar and LeadCloak's actions negatively impacted Facebook's services;
- The extent of Gajjar or LeadCloak's purported damage to Facebook's "reputation," "public trust," and "goodwill" (see Compl. ¶ 47), after taking into account the damage Facebook's own user data usage, fraudulent business practices, and numerous scandals have caused its "reputation," "goodwill" and "public trust";

- What other damages, if any, Facebook has suffered by the conduct alleged (which Facebook appears to have engaged in itself in far more egregious ways, and that Facebook has long known numerous other third-party advertisers engage in);
- The "value" of the data provided by Facebook to Gajjar or LeadCloak, if any;
- Whether Facebook's own conduct amounts to unclean hands, waiver, laches, or other equitable defenses;
- Whether Facebook terminated Gajjar's Facebook account, and the effect of such termination on Facebook's claims and requested remedies; and
- Whether Facebook provided notice of its revisions to its Terms of Service and Platform Policies to Gajjar and LeadCloak, and to what extent.
- Whether despite referencing 'Cloaking' on LeadCloak's website, is 'Cloaking' fraudulent, misleading or unlawful even though the actual meaning of "Cloaking" is not found in the dictionary and there are no authorities proving the same.

### 3. Legal Issues

Plaintiff's Statement:

Whether Gajjar's conduct breached Facebook's Terms of Service, Instagram's Terms of Use, and Facebook's Advertising Policies;

The extent to which Plaintiffs have been damaged as a result of such breaches.

Gajjar's Statement:

At this early stage, Gajjar cannot identify all disputed points of law. Nevertheless, there are a number of disputed points of law identified by Plaintiff's complaint. First and foremost, whether this Court has personal jurisdiction over Gajjar, which Gajjar respectfully submits he does not but recognizes the Court has ruled otherwise. Other issues identified thus far include:

- Whether Facebook, Inc. (as opposed to Facebook Ireland) can assert a breach of contract claim for the time period in which it was not a contracting party to Facebook's Terms of Service or Platform Policies?

- Whether Facebook provided adequate notice of its revisions to its Terms of Service and Platform Policies to Gajjar. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

- Whether Facebook's damages theory is appropriate under California law. *See Watson Labs., Inc. v. Rhone- Poulenc Rorer, Inc.*, No. CV 99-7947 AHM, 2001 WL 1673258, at *3 (C.D. Cal. Aug. 15, 2001) (precluding plaintiff from seeking disgorgement of lost profits in breach of contract action).

- Whether 'Cloaking' is considered fraudulent, unlawful or misleading as alleged by Facebook as Gajjar could not find such classification or description even in the dictionary, especially when LeadCloak was not built for circumventing Plaintiff's ad networks, and the software by itself could not circumvent Plaintiffs platforms as per their tests. Plaintiffs have not produced any evidence to prove that LeadCloak was able to successfully circumvent Plaintiff's ad platforms, and that LeadCloak blocked Facebook's IP addresses internally programmatically.

### 4. Motions

Plaintiffs moved to continue the case management conference on June 29, 2020, September 28, 2020, and December 29, 2020, pending service on Gajjar. ECF Nos. 11, 25, 28 (motions seeking continuance of CMC). The Court granted each of those motions. ECF Nos. 12, 26, 30 (orders continuing CMC).

On August 21, 2020, Gajjar moved to quash service of process and dismiss the complaint, ECF No. 18 (motion to quash), which he withdrew on August 28, 2020, based on stipulation of the parties. ECF No. 21 (stipulation re motion to quash).

On March 8, 2021, Gajjar moved to dismiss the complaint for lack of jurisdiction. ECF No. 32 (Gajjar's motion to dismiss for lack of jurisdiction). The Court denied Gajjar's motion to dismiss on May 2, 2022. ECF No. 73 (order denying Gajjar's motion to dismiss).

On October 28, 2021, Gajjar's counsel filed motions to withdraw. ECF Nos. 48, 50 (motions to withdraw). The Court granted Gajjar's counsel's motions to withdraw on March 4, 2022. ECF No. 75 (order granting motions to withdraw).

On November 2, 2021, Plaintiffs moved to compel further responses from Gajjar in connection with jurisdictional discovery, ECF Nos. 54-56 (joint discovery letter briefs), which the Court granted on November 16, 2021. ECF No. 60 (order compelling further discovery responses).

On April 20, 2022, Plaintiffs moved to dismiss Gajjar's counterclaims. ECF No. 77 (motion to dismiss counterclaims). And on April 29, 2022, Plaintiffs moved to strike Gajjar's affirmative defenses and counterclaims. ECF No. 83 (combined motion to strike). The Court granted Plaintiffs' motion and dismissed Gajjar's counterclaims and struck his affirmative defenses. ECF No. 92 (order dismissing counterclaims and striking affirmative defenses).

On July 15, 2022, Gajjar filed a motion for terminating sanctions. ECF No. 94 (motion for sanctions). This Court denied Gajjar's motion for terminating sanctions on August 23, 2022. ECF No. 101 (order denying motion for sanctions).

On August 1, 2022, Plaintiffs moved to strike Gajjar's affirmative defenses from his amended answer. ECF No. 96 (motion to strike). That motion is scheduled to be heard on October 6, 2022.

On August 19, 2022, Gajjar filed a motion for an extension of time to file a response to Plaintiffs' motion to strike Gajjar's affirmative defenses raised in his amended answer. ECF No. 99 (motion for extension of time). This Court granted Gajjar's motion for an extension of time on August 26, 2022. ECF No. 102 (order granting motion for extension of time).

Plaintiffs anticipate additional discovery motions where necessary, a motion for summary judgment, and pretrial motions.

Gajjar also anticipates filing a motion for summary judgment.

**5.   Amendment of Pleadings**

The parties do not anticipate amending the pleadings at this time.

**6.   Evidence Preservation**

Plaintiffs have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information and have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action. Plaintiffs shared the Guidelines with Gajjar on September 28, 2022.

**7.     Disclosures**

Plaintiffs propose an exchange of initial disclosures 14 days after the case management conference on October 11, 2022.

**8.     Discovery**

Plaintiffs propounded jurisdictional discovery requests on Gajjar on May 10, 2021. Gajjar served responses to Plaintiffs' requests on June 16, 2021. Pursuant to the Court's November 16, 2021 Order Regarding 11/2/21 Joint Discovery Letter Briefs, Gajjar served supplemental responses on November 30, 2021. Gajjar served further supplemental responses on December 24, 2021 and January 4, 2022. Plaintiffs intend to seek further discovery from Gajjar relating to the merits.

**Scope of Anticipated Discovery:**

Plaintiffs' Statement: Plaintiffs intend to seek further discovery—through depositions, interrogatories, document requests, and requests for admissions—on Gajjar's operations insofar as they relate to the wrongdoings alleged in the complaint, including discovery on at least the following topics:

- A complete description of Gajjar's cloaking services used to circumvent Facebook's ad review system;
- The structure and operation of Gajjar's cloaking services;
- Any computer code Gajjar used—directly or indirectly—to carry out his scheme as alleged in the complaint;
- Identities of individuals and entities who used Gajjar's cloaking software;
- Identities of individuals and entities who Gajjar enabled and encouraged to circumvent Facebook's ad review system;
- Identification of the true landing pages for ads cloaked using LeadCloak software;
- Identification of all ads run on Facebook or Instagram using LeadCloak software;
- Any advertising associated with Gajjar's cloaking services; and
- Revenue generated by Gajjar in connection with the activities alleged in the complaint.

Gajjar's Statement:

Gajjar intends to serve his discovery requests in the near future on at least the following topics:

- Explanation on the validity or the lack therefore of the purported "active" SlingFile Limited's ad account/contract with the Plaintiffs which they declared as an active contract under Herter's declaration.
- Explanation on how the Plaintiffs added Gajjar's Account #1 as the administrator of the SlingFile Limited's ad account Account #4, which was void *ab initio* and the ad account could not be accessed in the first place;
- Identification of billing details present on the alleged SlingFile Limited ad account;
- Identification of campaigns present on the alleged SlingFile Limited ad account;
- Sign-in/Login logs of SlingFile Limited ad account that includes but not limited to timestamps, IP addresses etc.;
- Identification of campaigns and URLs that Plaintiffs suspected belonged to LeadCloak's customers.

**Proposed Limitations on Discovery:** The parties do not believe it is necessary to modify the discovery rules set forth in the Federal Rules of Civil Procedure and Local Rules.

**Protective Order:** Plaintiffs will request that Gajjar stipulate to a protective order. Plaintiffs discussed the need for a protective order and a clawback agreement governing the inadvertent production of privileged documents with Gajjar's former counsel before they withdrew. Plaintiffs sent Gajjar's former counsel a draft stipulated protective order to Gajjar's counsel on July 6, 2021. Plaintiffs followed up with Gajjar's counsel on October 7, 2021. Neither Gajjar nor his former counsel responded.

**9.     Class Actions**

Not applicable.

**10.    Related Cases**

There are no related cases or proceedings pending before another judge of this Court, or before another Court or administrative body.

**11. Relief**

As set forth in the complaint, Plaintiffs seek a permanent injunction enjoining and restraining Gajjar and his agents, servants, employees, successors, and assigns, and all other persons acting in concert with or conspiracy with him or affiliated with Gajjar from accessing or attempting to access Facebook and Instagram's platform and computer systems; developing, offering, and marketing software or computer code intended to circumvent Facebook's ad review system, Facebook's or Instagram's technological limitations on access, and other enforcement measures; engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Facebook and Instagram's platform and computer systems; and engaging in any activity, or facilitating others to do the same, that violates Facebook's Terms of Service, Self-Service Ad Terms, and Advertising Policies, and Instagram's Terms of Use.

Plaintiffs also seek damages in amounts to be proven at trial, as well as pre- and post-judgment interest as allowed by law.

Gajjar asserts that Plaintiffs should take nothing from this action.

**12. Settlement and ADR**

The parties have discussed early mediation and are in the process of selecting a mediator.

Gajjar asserts that if this action is not resolved amicably via mediation, Gajjar anticipates filing for bankruptcy. This Court should not further contribute to the injustice created by the insurmountable disparity of wealth between a multi-billion dollar company and a private individual living in Thailand with less than $5,000 in savings.

**13. Consent to Magistrate Judge for All Purposes**

The parties have consented to have a magistrate judge conduct all further proceedings, including trial and entry of judgment. ECF Nos. 9, 34 (consent to magistrate judge).

**14. Other References**

The parties do not believe a reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation is necessary.

**15. Narrowing of Issues**

The issues cannot be narrowed at this time.

### 16. Expedited Trial Procedure

This is not the type of case that can be handled under the Expedited Trial Procedure of General Order No. 64 Attachment A.

### 17. Scheduling

The parties propose the following schedule:

| | |
|---|---|
| Designation of Plaintiffs' experts and provision of experts' reports | October 10, 2023 |
| Designation of Gajjar's experts and provision of experts' reports | November 9, 2023 |
| Discovery cutoff | December 11, 2023 |
| Filing of dispositive motions | January 10, 2024 |
| Hearing of dispositive motions | February 16, 2024 |
| Pretrial conference | March 25, 2024 |
| Trial | April 1, 2024 |

### 18. Trial

<u>Plaintiffs' Statement</u>:  Plaintiffs demand a jury trial.  Plaintiffs expect trial to last five to ten days.

<u>Gajjar's Statement</u>:  Defendant Gajjar does not have the time and resources to go through the trial for this frivolous lawsuit. If this action is not resolved amicably via mediation, Gajjar anticipates filing for bankruptcy. This Court should not further contribute to the injustice created by the insurmountable disparity of wealth between a multi-billion dollar company and a private individual living in Thailand.

### 19. Disclosure of Non-party Interested Entities or Persons

<u>Plaintiffs' Statement</u>:  Plaintiffs have filed the appropriate certification required by Civil Local Rule 3-15.  Pursuant to Civil L.R. 3-15, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

<u>Gajjar's Statement</u>:  Gajjar is not doing business as LeadCloak, which is its own entity owned by a business with its own proper corporate structure.  There is no basis in the Complaint for Gajjar to be considered as "doing business as" LeadCloak.  Plaintiffs allege no facts to support a naked allegation that Gajjar is doing business as LeadCloak, as opposed to merely having assisted with the software design of LeadCloak.

LeadCloak is not a dba of Gajjar *personally*. Gajjar has not filed his "Certification of Interested Entities" or persons, but during the jurisdictional discovery and in previous pleadings, has disclosed and proved that LeadCloak is a wholly owned subsidiary of SlingFile Limited, a Hong Kong Corporation, and that no publicly held company other than SlingFile Limited owned 10% or more of the stock of LeadCloak. Plaintiffs have failed to include SlingFile Limited as the indispensable party to the lawsuit.

As the Court has already noted in March 2, 2022 Order ECF 73, Gajjar, SlingFile Limited and LeadCloak are separate legal entities. Gajjar is not "doing business as" LeadCloak. There is nothing to connect the use of Gajjar's personal/consumer Facebook account to the conduct of a separate legal entity. LeadCloak's Contacts with the Forum Are Not Gajjar's Contacts. Plaintiffs make the flawed assertion that LeadCloak's contacts with California automatically attach to Gajjar and, therefore, Gajjar has contacts with California. As Gajjar mentions on numerous occasions in his motion, Gajjar is not LeadCloak.

Plaintiffs seek to undermine a foreign corporation's capacity to defend itself by claiming that an employee consented. Plaintiffs make no allegation (or demonstrate) that Gajjar violated the Facebook TOS directly. Conclusory charges regarding Gajjar's operation of LeadCloak do not warrant discussion in this forum.

**20.    Professional Conduct**

All attorneys of record for Plaintiffs have reviewed the Guidelines for Professional Conduct for the Northern District of California.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

**21.** **Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter**

The parties have no other matters to bring to the Court's attention at this time.

Dated: October 4, 2022							**HUNTON ANDREWS KURTH LLP**

By:    /s/ Jason Kim
				Ann Marie Mortimer
				Jason J. Kim
				Brandon M. Marvisi
			Attorneys for Plaintiffs
			Meta Platforms, Inc. (f/k/a Facebook, Inc.)
			and Instagram, LLC

Dated: October 4, 2022							**BASANT GAJJAR**

By:    /s/ Basant Gajjar
				Basant Gajjar
			Defendant

## ATTESTATION

I, Ann Marie Mortimer, am the ECF user whose ID and password are being used to file this document. In compliance with Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories

Dated: October 4, 2022							   /s/ Jason Kim
								Jason J. Kim